**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| **MIDWEST FAMILY FEDERAL CREDIT UNION,**<br><br>*Plaintiff*,<br><br>v.<br><br>**FISERV SOLUTIONS, LLC f/k/a FISERV SOLUTIONS, INC., and FISERV, INC.,**<br><br>*Defendants*. | Case No: 2:26-cv-00234<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Represented by NERKO PLLC, HECHT PARTNERS LLP, and DELANEY & DELANEY LLC, plaintiff Midwest Family Federal Credit Union ("**MWFFCU**"), alleges as follows against defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("**Fiserv Solutions**") and Fiserv, Inc. (collectively, "**Fiserv**"):

## PRELIMINARY STATEMENT

1. MWFFCU is a not-for-profit credit union. Fiserv, one of the world's largest providers of outsourced technology to financial institutions, sold itself to MWFFCU as a trusted custodian of the most sensitive data a financial institution can hold: consumers' transaction histories, account numbers, and personal information.

2. MWFFCU brings this action and seeks relief to prevent ongoing and irreparable harm caused by Fiserv's deficient and misrepresented cybersecurity practices. Fiserv falsely represents that it employs appropriate safeguards to protect the sensitive and confidential financial

data of MWFFCU credit union members. Fiserv has failed to implement basic, industry standard controls, leaving MWFFCU's systems and member information vulnerable to unauthorized access.

3. These risks are not hypothetical – they are present and continuing.

4. Under its Master Agreement, Fiserv pledged to protect MWFFCU's data with the same high-tech safeguards Fiserv uses for its own information and in full compliance with federal standards. But the reality was starkly different. Fiserv sold and operated systems that were so insecure that no regulated financial institution should have been asked to run its confidential data through them. Fiserv's systems lack basic security controls. They easily expose consumer data. And Fiserv kept selling them—while falsely assuring MWFFCU and its other financial institution customers that everything was secure.

5. Fiserv's double standard makes its breaches unmistakable. For its own corporate data, Fiserv deploys layered, possession-based multi-factor authentication (MFA), token generators, and biometric controls. For MWFFCU's systems, Fiserv withheld these protections. Instead, it relied on authentication methods so weak and susceptible to hacking that federal standards expressly do not permit their use.

6. MWFFCU cannot fix these security failures on its own. Fiserv controls the systems that store and process MWFFCU's data. As long as those systems remain inadequately secured, MWFFCU's systems remain unsecured and MWFFCU faces ongoing hacking risks. Each day that passes without proper controls compounds that risk.

7. Fiserv has converted its own security failures into an upsell opportunity. If MWFFCU seeks to leave and transfer its data to a safer provider, Fiserv would demand seven-figure "early termination" and deconversion fees as the price of release. Fiserv's ultimatum is clear: pay the ransom, or leave your data exposed on systems Fiserv refuses to adequately secure.

8. Staying with Fiserv offers no refuge. Acknowledging its own deficiencies, Fiserv announced that it will discontinue its existing "Enhanced Authentication" or "Intelligent Authentication" product and force credit unions to purchase an upgrade marketed as "SecureNow," supposedly to provide additional security.

9. SecureNow does not solve the problem. It is not secure. It does not comply with federal standards for MFA. It falls far below the standard Fiserv uses to protect its own corporate data. And SecureNow does not address the myriad of other Fiserv systems that are not secure. So, even after paying for the upgrade to SecureNow, a financial institution remains exposed to hacking risks.

10. In sum, Fiserv has attempted to monetize its own security failures by forcing credit unions to choose between paying to escape unsafe systems or paying again for ostensible security services that do not provide proper protection.

11. This is Fiserv's business model. According to *The Wall Street Journal*, Fiserv's misconduct is part of a pattern of victimizing small financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv ceases to make the proper financial investments to keep up with emerging technology and security risks—while attempting to lock financial institutions into long-term contracts, attempting to intimidate and silence its customers from disclosing to other affected customers when there are security problems, and holding customers' data hostage when those customers seek to go to competitors. This gambit has fattened Fiserv's profits but exploited small financial institutions and the customers they serve. *See Frustrated by the Tech Industry, Small Banks Start to Rebel*, THE WALL STREET JOURNAL (April 11, 2019), https://www.wsj.com/articles/small-banks-rebel-

against-the-most-important-tech-firms-you-have-never-heard-of-11554975000. **Exhibit 1** is a true and correct copy of *The Wall Street Journal* article.

12. MWFFCU brings this action to recover damages and to obtain declaratory and equitable relief that blocks Fiserv's improper exit charges and protects MWFFCU's members.

## PARTIES

13. Plaintiff MWFFCU is a federally chartered, not-for-profit credit union with localized operations in Indiana. MWFFCU has a principal place of business at 2832 Willowcreek Rd., Portage, Indiana 46368.

14. Upon information and belief, defendant Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc., is a limited liability company organized under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203. Upon information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc.

15. Upon information and belief, defendant Fiserv, Inc. is a corporation incorporated under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

16. At all relevant times, each defendant acted as the agent of the other defendant and within the scope of that agency. Each defendant acted with the other defendant's authority, knowledge, consent, and ratification of the acts and omissions alleged in this Complaint.

## JURISDICTION AND VENUE

17. This Court has original subject-matter jurisdiction over MWFFCU's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over MWFFCU's state-law claims 28 U.S.C. § 1367(a) because these claims are so related to the claims in the action within such

original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

18. This Court also has subject-matter jurisdiction over MWFFCU's claims under 28 U.S.C. § 1332 (diversity) because there is complete diversity of citizenship among the parties given that MWFFCU is a citizen of a different state than either defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

19. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the misconduct occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

20. This Court has personal jurisdiction over Fiserv because Fiserv operates in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction.

## FACTUAL BACKGROUND

21. MWFFCU is a not-for-profit, member-owned financial institution serving over 2,500 members in Porter County, Indiana. MWFFCU offers a range of banking and financial services for the Porter County community, including checking accounts, savings accounts and money markets, savings share certificates, individual retirement accounts (IRAs), debit and credit cards, online banking, loan products (such as home loans, car loans, and personal loans), and business banking. MWFFCU was chartered in 1962, originally to serve the employees of Midwest Steel. With over $39 million in assets and serving thousands of members, MWFFCU is a community-focused and growing financial institution.

22. MWFFCU's members include those who live, work, worship, attend school, volunteer, or have business and other legal entities in Porter County; employees of MWFFCU; the immediate family members of existing members; and spouses of deceased members. MWFFCU

is a professionally managed financial institution offering personalized service and a wide array of financial services.

23. Fiserv is among the largest technology vendors to credit unions and banks. It claims approximately 10,000 financial institution clients and provides technology to more than one in three U.S. financial institutions.

24. MWFFCU contracted with Fiserv to provide technology services under a Master Agreement dated June 28, 2019, as amended. **Exhibit 2** contains true and correct copies of the Master Agreement and the amendments.

25. Fiserv stores and processes MWFFCU's most sensitive information, including member names, dates of birth, Social Security Numbers, banking account numbers, balances, transaction histories, and other highly sensitive, personally identifying information, across various Fiserv systems.

26. **Contractual Standard of Care**. Under the Master Agreement, Fiserv was required to follow the following standards of care:

a. Section 3(b) of the Master Agreement requires Fiserv to "use the same care and discretion to prevent unauthorized disclosure of information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law." (**Exhibit 2** at § 3(b).)

b. Section 4(a) of the Master Agreement requires Fiserv to implement and maintain an information security program that is designed to meet the following objectives:

  i. "protect the security and confidentiality of customer information;"

ii. "protect against any anticipated threats or hazards to the security or integrity of such information;"

iii. "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer;" and

iv. "ensure the proper disposal of 'consumer information.'" (**Exhibit 2** at § 4(a).)

c. The Virtual Branch Services Schedule to the ASP Services Exhibit requires Fiserv to provide "Enhanced Authentication," beyond a baseline level of minimally acceptable authentication.

27. Fiserv protects its own confidential data with robust, high-assurance measures, including token-generated codes, biometric identifiers, and other layered authentication controls, in addition to phishing-resistant multi-factor authentication.

28. Fiserv's *Cybersecurity Fact Sheet 2025*, *Standard Information Gathering Questionnaire*, and *SOC 1 Type 2 Report* assert that Fiserv employs a robust cybersecurity program, including the implementation of multi-factor authentication (MFA) as part of its security strategy. These documents outline Fiserv's commitment to industry standards and regulatory requirements, including National Institute of Standards and Technology ("NIST") and International Organization for Standardization ("ISO") frameworks.

29. Fiserv's *Cybersecurity Fact Sheet 2025* (a true copy of which is annexed hereto as **Exhibit 3**) states that Fiserv "has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications . . . . The policy and supporting standards have been designed to meet applicable industry and regulatory

requirements, including . . . National Institute of Standards and Technology (NIST) Cyber Security Framework, 800-53, 800-63-3." (**Exhibit 3** at 3.)

30. In Fiserv's *Standard Information Gathering Questionnaire* (a true copy of which is annexed hereto as Exhibit 4), Fiserv was asked "Is Multi-Factor Authentication (MFA) utilized?" Fiserv responded, "Yes." (**Exhibit 4** at row H.4.)

31. As described in the *SOC 1 Type 2 Report: Fiserv Enterprise Technology* (a true copy of which is annexed hereto as **Exhibit 5**), Fiserv requires its employees accessing Fiserv's systems to use "two-factor authentication that includes a token-generated one-time code." (**Exhibit 5** at 130.)

32. **What MWFFCU Received**. Despite these contractual obligations, Fiserv failed to implement these equivalent protections for MWFFCU's confidential information. Instead, Fiserv deployed materially weaker controls.

33. **Why MFA Matters**. MFA is an additional security control that counters the most common hacking vector, a compromised password, by requiring two or more distinct factors: something the user knows (such as a password), possesses (such as a device or token), or is (such as a biometric verification).

34. Not all MFA is created equal. Some forms, such as codes sent by email or text, do not establish possession of a particular device. Those forms provide inadequate security because they are susceptible to hacking by interception, SIM-swap, or account takeover.

35. Federal standards and supervisory guidance reinforce these differences. The Federal Financial Institutions Examination Council's *Authentication and Access to Financial*

*Institution Services and Systems*[1] adopts the *Digital Identity Guidelines* of the NIST, which mandates: "Methods that do not prove possession of a specific device, such as . . . email, SHALL NOT be used for out-of-band authentication." *See* NIST SP 800-63B § 5.1.3.1.[2] The *Digital Identity Guidelines* further require that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id*. § 5.1.5.2.

36. A July 2025 update to NIST's *Digital Identity Guidelines* (a true copy of which is annexed hereto as **Exhibit 6**) reinforces that codes sent by email are insufficient to provide proper MFA: "Email SHALL NOT be used for out-of-band authentication because it may be vulnerable to:

- Access using only a password
- Interception in transit or at intermediate mail servers
- Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing."[3]

37. Codes sent by text message are not secure. The United States Cybersecurity and Infrastructure Security Agency describes text message codes as a "last resort MFA option" and appropriate only as a "temporary solution when organizations transition to a stronger MFA implementation."[4] This is because it is fairly simple to intercept or redirect text messages, so a text message code is insufficient to satisfy the "what you have" factor. Text messages are transmitted without encryption, making them vulnerable to network-level compromise.

1 https://www.ffiec.gov/sites/default/files/media/press-releases/2021/authentication-and-access-to-financial-institution-services-and-systems.pdf.
2 https://pages.nist.gov/800-63-3/sp800-63b.html.
3 https://nvlpubs.nist.gov/nistpubs/SpecialPublications/NIST.SP.800-63B-4.pdf.
4 https://www.cisa.gov/sites/default/files/2023-01/fact-sheet-implementing-phishing-resistant-mfa-508c.pdf.

38. On at least one system housing MWFFCU's confidential information, Fiserv has not required any MFA or email passcode challenge at all.

39. For other systems housing MWFFCU's confidential information, Fiserv relied on an email passcode challenge instead of MFA. Email does not establish possession of a specific device and does not qualify as a second factor under federal regulatory guidance. Nor does Fiserv use this weak method to secure its own confidential information. It therefore fails to meet the standard of care Fiserv owes MWFFCU under the Master Agreement.

40. On other access paths, Fiserv uses codes sent over text message. Text message codes are insufficient to satisfy the possession factor of MFA. As federal regulatory guidance explains, text message codes are a temporary bridge to stronger, phishing-resistant MFA. Fiserv deploys stronger possession-based MFA such as token- or app-based authenticators to protect Fiserv's own confidential information but has failed to provide equivalent protections to MWFFCU. Fiserv's failure constitutes a material breach of the Master Agreement.

41. Fiserv's failure to deploy promised safeguards has resulted in MWFFCU paying for services that were not properly performed. Meanwhile, Fiserv has materially increased the risk of hacking and unauthorized access to MWFFCU's extraordinarily sensitive confidential information.

***Fiserv's Pattern: Known Security Gaps, False Assurances, and Active Concealment***

42. Fiserv has long known that the authentication controls on the systems it sells to financial institutions suffer from serious security defects. Yet Fiserv has continued to sell, deliver, and operate those platforms while assuring financial-institution clients that their systems and data remain secure. Fiserv's knowing and willful misconduct—a combination of knowledge of security

problems, false assurances its systems had certain security controls, and concealing the absence of security controls—amounts to fraud.

43. Fiserv received repeated warnings that its controls failed to protect financial institutions. Instead of fixing root causes, Fiserv relied on outdated practices and patchwork responses. Those choices exposed MWFFCU's member information to compromise by hackers and forced MWFFCU —and other institutions—to operate under hidden, avoidable risk.

44. In August 2018, *Krebs on Security* reported a Fiserv defect that allowed unauthorized access to consumers' account and transaction records and allowed changes to phone numbers and email addresses used for transaction alerts.[5]

45. Customers attempted to alert Fiserv. Yet Fiserv did not treat the defect as urgent. Fiserv acted only after media scrutiny made inaction reputationally costly.

46. Despite customer efforts to notify Fiserv directly (including messages sent to the social media accounts of Fiserv's CEO and various other individuals who were identified as affiliated with Fiserv), Fiserv ignored these warnings until media scrutiny compelled it to implement a fix.

47. Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known threat until ***after*** receiving an inquiry from a ***reporter***—when negative press coverage was imminent. According to Ms. Cave, "[a]fter receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the

---

[5] "Fiserv Flaw Exposed Customer Data at Hundreds of Banks," https://krebsonsecurity.com/2018/08/fiserv-flaw-exposed-customer-data-at-hundreds-of-banks/.

situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

48. Fiserv's lackadaisical approach to cybersecurity persists to this day.

49. Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. For example, one of Fiserv's own employees recognized the inadequacy of Fiserv's support and outreach channels. In a post responding to another *Krebs on Security* article about additional security problems with Fiserv's online banking platform, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his personal social media account[6] so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns." Kinder's public admission tracks what Fiserv's customers experienced: Fiserv's formal channels did not reliably surface or remediate high-risk security defects.

---

[6] Fiserv's Code of Conduct & Business Ethics, which was in effect at or around the time of Kinder's comment, contains a social media policy that covers the use of LinkedIn, Twitter, Facebook, forums, and blogs, and Fiserv regulates its employees' use of Fiserv's trademarks on social media. Fiserv notes that social media "is an established part of many people's personal and professional lives-and the lines have blurred." *See* https://web.archive.org/web/20230601125645/https://investors.fiserv.com/static-files/2cef514b-b67b-45c7-9aaa-70ccedbdb25c. The current version of Fiserv's Code of Conduct & Business Ethics, which contains the same social media policy is available at https://d1io3yog0oux5.cloudfront.net/_583f477852403c9df0b7b630e3701167/fiserv/db/2275/21421/file/Code+of+Conduct+%26+Business+Ethics.pdf. Accordingly, Fiserv knows, or should have known, about communications sent to the social media accounts of its agents who have identified themselves as Fiserv representatives on social media platforms.

50. For Fiserv, serious efforts at compliance often begin at the proverbial courthouse steps. When regulated financial institutions demand that Fiserv honor its security and oversight obligations, Fiserv resists until litigation forces the issue and compels action. Public filings reflect that pattern.

51. In 2022, the U.S. Courthouse SDNY Federal Credit Union, the credit union serving judges and employees of the U.S. District Court for the Southern District of New York (the "Court Credit Union"), discovered security problems with Fiserv's online-banking applications. In particular, the Court Credit Union found that Fiserv's authentication controls were weak and could easily be bypassed, allowing Court Credit Union online banking accounts to be hacked.

52. This potential for hacking raised significant additional concerns for the Court Credit Union and its members—Federal judges, U.S. Marshals and court employees. A hacker of the Court Credit Union would be able access nonpublic personal information and transaction history, such as a member's home address and usage patterns for a debit card. Such information could facilitate stalking, harassment or other criminal conduct directed at those members.

53. The Court Credit Union decided to terminate its relationship with Fiserv largely on account of these security failures. Fiserv demanded an early-termination fee before it would permit Court Credit Union to terminate its relationship.

54. The Court Credit Union sued Fiserv over the online-banking security failures that Fiserv refused to address and to challenge Fiserv's asserted early-termination fee when the Court Credit Union decided to exit Fiserv for a more secure system while undergoing a merger with another credit union. *U.S. Courthouse SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, Case No. 1:22-cv-09329 (S.D.N.Y. 2022).

55. Fiserv resolved the case shortly after it was filed. But Fiserv's prioritization of early termination fees and maintaining leverage over the Court Credit Union instead of fixing security problems prolonged the exposure of the Credit Union's members—judicial personnel and U.S. Marshals—to the risk of hacking.

56. Other litigation raising security concerns includes: *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:19-cv-00624-RJC (W.D. Pa. 2019); *Cencap Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 3:25-cv-00913-VDO (D. Conn. 2025); *Self-Help Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 1:25-cv-01112-TDS-LPA (M.D. N.C. 2025); *FiCare Federal Credit Union v. Fiserv Solutions, Inc. et al.*, Case No. 8:26-cv-00231-JLB-TGW (M.D. Fla. 2026); *POLAM Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:26-cv-02352-JFW-DFM (C.D. Cal. 2026); and *Educational & Governmental Employees Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 7:26-cv-02402-NSR (S.D.N.Y. 2026).

57. In 2019, the Bessemer System Federal Credit Union sued Fiserv in the Western District of Pennsylvania for failing to safeguard its information properly. Given Fiserv's security problems and apparent inability to fix them, Fiserv agreed to return the credit union's records. After Fiserv failed to dispossess itself of the records, the credit union filed a motion for injunctive relief compelling Fiserv to return the records.

58. In response, Fiserv unequivocally represented to the Bessemer Court it had fully returned the credit union's records, which was central to the court's denial of injunctive relief. Fiserv falsely represented to the Court that it had provided the credit union with "a complete set of" the requested records. *See* Letter dated June 26, 2019, at 2 (a true copy of which is annexed hereto as **Exhibit 7**). Specifically, Fiserv's opposition to a preliminary injunction filed with the

court claimed that "[d]efendants indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false." *Id*.

59. The Bessemer court denied an injunction, based on Fiserv's assurances that the credit union's records had been returned. *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), Dkt. 26.

60. Later, Fiserv provided the credit union with hundreds of records that Fiserv previously assured the Bessemer court it had already returned—confirming that Fiserv misled the credit union's counsel and the court.

61. Instead of candidly disclosing known defects to its clients and coordinating remediation, Fiserv actively concealed defects from becoming known to its clients. When Bessemer System Federal Credit Union reported security problems that allowed online banking accounts to be readily taken over by hackers, Fiserv demanded that the credit union "[r]efrain from dissemination or disclosure of any information or records relating to the 'security review' to third parties, including any clients . . . of Fiserv." Those threats and misconduct did not protect Fiserv's customers; it protected Fiserv's reputation and revenue.

***Fiserv's "Sunset" Play: Remove Security Features Mid-Contract, Then Sell Those Features Back as "SecureNow" with Additional Pricing***

62. Fiserv puts revenue first. On January 8, 2026, it sent its credit union customers an "Enhanced Authentication Product Sunset Notice." The notice stated that Fiserv would discontinue the existing "Enhanced Authentication" feature for Virtual Branch Next, effective May 31, 2026. A copy of the notice is annexed hereto as **Exhibit 8**.

63. "Enhanced Authentication" is a lie. Fiserv has failed to provide even baseline authentication for MWFFCU, much less any "advanced" authentication.

64. Fiserv paired the withdrawal of Enhanced Authentication with a sales deadline. Fiserv's notice said that credit unions must sign a new agreement by March 2, 2026, to receive a replacement service Fiserv marketed as "SecureNow," which it touted as "additional security" for Virtual Branch Next.

65. SecureNow is not an "upgrade." It is a mid-contract shake-down. Fiserv already owes MWFFCU and its other customers a contractual duty to safeguard their confidential information. Fiserv cannot pull back security features mid-contract and then sell them back under new terms and higher pricing.

66. SecureNow does not solve the problem it claims to address. SecureNow does not provide possession-based MFA and therefore fails to address the root cause of online banking account takeovers. Even a credit union that pays for SecureNow remains exposed to hackers and cannot meet evolving regulatory expectations for protecting member information.

67. In a February 12, 2026, webinar for its clients, Fiserv's representatives disclosed that SecureNow's authentication process was weaker than advertised. Those representatives confirmed that rather than requiring the use of a one-time password for every login attempt, SecureNow would only require the use of OTPs for every log in initially. Once the system "learned the behavior" of the users, it would only require an OTP if there was something out of the ordinary, such as a login from a new device or a new location.

68. Fiserv continues to pressure its credit union customers to sign up for SecureNow, sending follow-up notices concerning the requirement to enroll in SecureNow as recently as March 6, 2026. A copy of the March 6, 2026, follow-up notice is attached as **Exhibit 9**.

69. Fiserv's intent is to compel enrollment in SecureNow. In the February 12, 2026, webinar, Fiserv's representatives stated that implementation of SecureNow was mandatory. One

of Fiserv's executives confirmed during the webinar that access to online banking would be "paused" after the May 31, 2026, deadline imposed by Fiserv until the credit union put SecureNow in place.

***Fiserv Defrauds Its Financial Institution Customers, Including MWFFCU***

***1. Fiserv Provides a Fraudulent "Compliance Package" to Financial Institutions Misrepresenting the Security Controls Fiserv Has on Its Systems***

70. As a regulated financial institution, MWFFCU must conduct oversight of third-party vendors such as Fiserv. To facilitate and influence that oversight, Fiserv provides its financial-institution customers a "Compliance Package" that represents Fiserv has implemented security measures to meet financial-institution regulatory requirements

71. Fiserv updates its compliance package from time to time and assures MWFFCU that Fiserv continues to comply with evolving regulatory and industry requirements. The representations in Fiserv's compliance package were false and misleading.

72. Among the materials in Fiserv's compliance package is Fiserv's *Standard Information Gathering Questionnaire*. MWFFCU and other Fiserv customers use this questionnaire to assess Fiserv's security posture and vendor risk.

73. The questionnaire asks: "Are policies and standards based on accepted control standards, frameworks, and industry practices?"

74. Fiserv answered "Yes," and further represented that Fiserv's cybersecurity policies and standards track NIST and other recognized standards. Specifically, Fiserv represented, among other things:

> Fiserv has established a Global Cybersecurity and Technology Management Policy based on NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard. The Global Cybersecurity and Technology Management Policy and standards have been designed to meet applicable industry and regulatory requirements.

- Interagency Guidelines Establishing Information Security Standards and on Response Programs for Unauthorized Access to Customer Information and Customer Notice
- EU General Data Protection Regulation (GDPR)
- Applicable European Banking Authority (EBA) guidelines
- Fair Credit Reporting Act (FCRA)
- Gramm-Leach-Bliley Act (GLBA)
- Health Insurance Portability and Accountability Act (HIPAA)
- Numerous state and /or country specific privacy and security laws including the IT Security Act 2.0 from the German Federal Office for Information Security
- International Organization for Standardization (ISO) 27001, Information Security Management
- National Institute of Standards and Technology (NIST) Cyber Security Framework
- Payment Card Industry Data Security Standard (PCI DSS)

75. Those statements were false and misleading. As described above, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements.

76. The questionnaire also asks: “Is Multi-Factor Authentication (MFA) utilized?” Fiserv answered: “Yes.”

77. That statement was false and misleading. As described above, Fiserv did not utilize MFA on at least one of its systems, and the authentication process used does not meet recognized standards for MFA.

78. Fiserv also provided MWFFCU with a *Fiserv Cybersecurity Fact Sheet 2025*, which again represented that “Fiserv has established a Global Cybersecurity and Technology

Management Policy based on authoritative sources that include regulatory and industry publications such as NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard." *See* **Exhibit 3,** at 3.

79. The *Fiserv Cybersecurity Fact Sheet 2025* further represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." *Id.*

80. Those statements were false and misleading. As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

81. Fiserv's *Global Data Ethics and Privacy Program Fact Sheet 2025* represents that Fiserv that adopted privacy principles – regardless of location – which use "appropriate security safeguards" and "[r]ecognizes the importance of data privacy and holds [Fiserv] accountable to [its] data protection standards." Those statements were false and misleading. Fiserv has failed to adequately use MFA leaving sensitive accounts exposed and has failed to meet applicable industry and regulatory standards including NIST standard.

***2. The Reliability of Fiserv's "Independent" SOC Report is Tainted by Longstanding Conflicts of Interest***

82. Fiserv's compliance representations to MWFFCU rest heavily on its SOC 1 Type 2 Report (the "SOC Report"), which Fiserv furnishes to financial institution customers as independent assurance that its security controls are adequate. Federal regulations require credit unions to obtain and review such audits in conducting vendor oversight. *See* 12 C.F.R. Part 748, App'x A § II.D.3. MWFFCU relied on the SOC Report in evaluating Fiserv's security posture and in fulfilling its own regulatory obligations.

83. The SOC Report is prepared by Deloitte & Touche LLP ("Deloitte"), which serves as Fiserv's independent service auditor. In Section 1 of the SOC Report, Deloitte attests that its examination was conducted in accordance with AICPA attestation standards and that it maintained independence under the AICPA Code of Professional Conduct.

84. Deloitte has served as Fiserv's independent registered public accounting firm since at least 1985 — a relationship spanning four decades. Fiserv's own 2025 proxy statement touts the "operational efficiencies" of retaining an auditor with a "meaningful history with the company." Fiserv, Inc., Definitive Proxy Statement, dated April 2, 2025, at 68 (located at https://investors.fiserv.com/static-files/f5f0467c-9b4b-4be8-a962-7408610d77c4) (last accessed May 21, 2026), a true copy of which is annexed hereto as **Exhibit 10**.

85. In 2023, Fiserv paid Deloitte fees exceeding $23 million, and in 2024, fees exceeding $24 million.

86. The independence concerns are compounded by personnel overlap between Fiserv and Deloitte. Fiserv's current Chief Risk Officer (CRO), Joanne Sebby, previously served as an Audit Manager at Deloitte before joining Fiserv, where she rose through senior audit, security, risk, and compliance roles, including serving as Fiserv's Chief Audit Executive, before assuming the CRO position. A true and correct copy of the biography of Joanne Sebby on Fiserv's website, located at https://www.fiserv.com/en/about-fiserv/executive-leadership/joanne-sebby.html and accessed on April 17, 2026, is annexed hereto as **Exhibit 11**. Ms. Sebby also served as a liaison to the Federal Financial Institutions Examination Council, which establishes the cybersecurity standards at issue in this litigation. *See* ¶ 35, *supra*. Upon information and belief, Ms. Sebby has personal, first-hand knowledge of these standards, yet failed to implement them at Fiserv or

conduct other appropriate risk assessments to ensure Fiserv was protecting the highly sensitive information its customers entrusted.

87. As described in the SOC Report, the CRO is a member of Fiserv's Management Committee with "leadership responsibilities for the Enterprise Risk & Controls function." Under Fiserv's "Three Lines of Defense" governance model, the CRO occupies the Second Line of Defense: the executive directly responsible for the design, maintenance, and oversight of risk management practices, including the enterprise-level security controls applicable to all Fiserv products. The Third Line of Defense — Internal Audit — is described as providing "independent and objective assurance," a function now performed by the very firm that previously employed the CRO.

88. These facts describe precisely the kind of "familiarity threat" that the AICPA Code of Professional Conduct recognizes. A familiarity threat requires identification, evaluation, and the application of safeguards to preserve the auditor's independence and professional skepticism.

89. On information and belief, neither Fiserv nor Deloitte disclosed to MWFFCU the existence of this threat, the safeguards (if any) applied to address it, or any limitations on the scope or reliability of the SOC Report resulting from these relationships.

90. The significance of these conflicts is magnified by the central role the SOC Report plays in Fiserv's compliance representations. The SOC Report is one of the principal vehicles through which Fiserv assures financial institution customers that its security controls are adequate and compliant with industry and regulatory standards. If the independence of the audit underlying the SOC Report is compromised, the assurances Fiserv derives from it — and passes on to MWFFCU, other Fiserv customers, and government financial institution regulators — are unreliable.

91. Fiserv's failure to disclose the conflicts of interest affecting the reliability of its SOC Report is consistent with its broader pattern of concealment. Rather than provide MWFFCU with transparent, independently verified information about the security of its systems, Fiserv furnished audit materials whose independence and objectivity were open to serious question, while representing those materials as trustworthy.

***3. Fiserv Publishes a False and Misleading Privacy Notice***

92. Fiserv, Inc. publishes a publicly available "Privacy Notice" that states, as present fact, the security measures Fiserv claims it has in place to protect customer data. The Privacy Notice purports to apply to Fiserv, Inc. and all subsidiaries and affiliates, including Fiserv Solutions.[7]

93. In Section 6, Fiserv represents it has "in place appropriate security measures to prevent . . . personal data from accidentally being lost, used or accessed in an unauthorized way, altered or disclosed."

94. That statement was false and misleading when made. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent MWFFCU's data from being used or accessed in an unauthorized way.

95. Fiserv's misrepresentations and concealments harmed MWFFCU in a straightforward way: it deprived MWFFCU of material facts that would have altered MWFFCU's decisions about risk, vendor oversight, and continued use of Fiserv services. Fiserv withheld the truth while continuing to accept payment for services it represented as secure and compliant with contractual and legal requirements.

---

[7] A copy appears at https://www.fiserv.com/en/about-fiserv/privacy-notice.html.

96. Fiserv had strong financial motives to sustain the appearance of robust cybersecurity to maintain market and customer confidence in its systems. Fiserv's public filings reflect that goodwill and intangible assets comprise a significant portion of Fiserv's corporate assets, and as a publicly traded company, Fiserv's valuation depends on market and customer confidence in its systems. By suppressing adverse security information and downplaying risk, Fiserv misleadingly obtained customer revenue, reduced its customers' switching pressure, and fattened corporate goodwill—at its customers' expense.

97. Fiserv's incentives to deceive intensified recently as Fiserv's share price fell sharply. Fiserv's stock is down approximately 70% over the past year, heightening Fiserv's pressure to avoid disclosures that could further impair market confidence and customer retention.

98. Fiserv's misconduct was far from accidental. Fiserv knew about material security defects, minimized or misrepresented them, delayed remediation until external exposure threatened, and pressed to suppress the truth from its customers.

99. Fiserv's course of conduct shows willful, wanton, and reckless disregard for the privacy and security of financial-institution customers and their members and supports an award of punitive damages.

100. As a direct result of Fiserv's misconduct, MWFFCU has incurred and will continue to incur substantial costs to protect members, monitor for fraud, investigate suspicious activity, and mitigate long-tail identity-theft risks created by Fiserv's security failures.

### *4. The Severe Impact on MWFFCU and Its Members*

101. The information entrusted to Fiserv includes highly sensitive personal and financial data. If compromised, identity thieves can weaponize that data to drain accounts, change contact credentials, defeat fraud alerts, and impersonate members across other systems.

102. The harm does not end with a single incident. Once exposed, member information can circulate indefinitely, including through illicit marketplaces. Members face continuing risk of identity theft, account takeover, and downstream fraud—often months or years after the original exposure.

103. Cybercriminals also exploit stolen data to inflict non-monetary harms, including harassment, extortion attempts, and targeted stalking. Transaction times and locations can reveal personal routines and physical whereabouts.

104. Most importantly, members face irreparable harm when hackers gain access to their most sensitive financial information. Transactional data can reveal intimate facts of members' lives, including, for example, which members paid retainers to a divorce attorney, or which members received care from a psychiatrist, drug-rehabilitation clinic, cancer center, fertility clinic, or abortion clinic.

105. Public reporting has recognized the hidden emotional toll of data breaches, a unique form of irreparable harm. While some victims report direct financial impacts, many more—50%—report emotional harm. Nearly one-third said a breach had affected their physical well-being, and nearly a quarter said their relationships were personally affected. Data breaches can expose diagnoses, medical procedures, and other highly sensitive personal information while leaving victims living with persistent anxiety: when will criminals use my data, and how? *See The Hidden Emotional Toll on Victims of Data Breaches*, THE WALL STREET JOURNAL (Nov. 25, 2025), https://www.wsj.com/tech/cybersecurity/data-breach-victims-0b01a5ab?mod=Searchresults&pos=2&page=1. **Exhibit 12** is a true and correct copy of *The Wall Street Journal* article.

106. Criminals can also use MWFFCU's member information to fuel embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. For example, the times and locations members use their debit cards can be used to stalk and victimize those individuals. A report from the United States Government Task Force on Identity Theft explains the harm to MWFFCU:

> Businesses suffer most of the direct losses from ... identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.
>
> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit . . . .
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.[8]

107. To put it into context, the FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints related to various internet scams impacting American citizens around the globe, amounting to a staggering

[8] The President's Identity Theft Task Force, Combating Identity Theft: A Strategic Plan, Federal Trade Commission, 11 (April 2007).

$50.5 billion in reported losses, and an average of 836,000 complaints received per year. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud, and identity theft accounted for $2.19 billion in losses. The average reported loss per complaint in 2024 was $19,372.[9]

108. Stolen data can also be offered for sale on the "dark web," a heavily encrypted part of the internet that makes it difficult for authorities to detect a website's location or owners. The dark web is not indexed by normal search engines such as Google and is accessible only by using a Tor browser (or similar tool), which aims to conceal users' identities and online activity. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and personal information. Sites on the dark web appear and disappear quickly, providing cover for illegal transactions.

109. Once a bad actor buys member information, it can then be used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

110. In addition to member information that can be accessed, a hacked online banking account can be very valuable to cyber criminals for other attacks. Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

111. The problems associated with identity theft are exacerbated by the fact that many identity thieves will delay exploiting stolen information, extending the threat of identity theft long after the initial breach. The stolen data may be listed for sale on the dark web years after the initial

[9] *See* https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

breach, enabling unauthorized individuals to purchase and exploit it after the security incident has faded from immediate concern.

112. Compounding this risk is the practice known as "dwell" by hackers, where unauthorized access remains undetected for extended periods, amplifying long-term harm. During this time, cybercriminals can continue exploiting across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the hack going unnoticed until long after the initial breach, amplifying the potential for further exploitation.

113. Because hackers can remain undetected for extended periods and delay the use of stolen information, the full scope of a breach may not be immediately apparent. Indeed, in order to protect its member information, MWFFCU will need to remain vigilant against compromise and unauthorized use of its member information for years and decades to come.

***5. MWFFCU Delivers a Notice of Breach and Requests Information Pursuant to the Master Agreement: Fiserv Ignores Its Obligations***

114. MWFFCU has experienced many security and technological deficiencies in Fiserv's products during the course of the Master Agreement. In light of these material problems, MWFFCU conducted a review of the security controls Fiserv provides to MWFFCU.

115. MWFFCU's review identified that Fiserv failed to implement a compliant MFA on MWFFCU's online banking website and mobile application used by members to conduct online banking activities.

116. The Client360 system, which is used by credit union and Fiserv employees for service tickets, change orders, and communications that can include confidential information and requests affecting system security, did not have proper MFA implemented. This system has an email-delivered passcode.

117. The security review also identified that other systems used by credit union employees to host confidential information were not protected by proper MFA, including: Portico, Nautilus Essentials, Wisdom Accounting Suite, PartnerCare, Portico, Reporting Analytics, xExchange, and WC3.

118. Given the ongoing security risks, and Fiserv's refusal to deal with them in a timely manner, MWFFCU sent Fiserv a Notice of Breach on or about September 19, 2025. A copy of the Notice of Breach is annexed hereto as **Exhibit 13**.

119. In addition to notifying Fiserv of its breaches of the Master Agreement and demanding that Fiserv remedy those breaches, MWFFCU also exercised its right under the Master Agreement to request information concerning Fiserv's performance (or lack thereof). Specifically, MWFFCU's requests included:

a. Copies of audits, summaries of test results, and other equivalent evaluations of Fiserv's security, as required by § 4(a) of the Master Agreement and 12 C.F.R. Part 748, Appendix A;

b. A summary of Fiserv's written information security plan for the services provided to MWFFCU within 30 days, as required by § 4(b) of the Master Agreement;

c. Documentation supporting the amounts invoiced by Fiserv for the 12-month period prior to the date of the Notice of Breach, as required § 10(b) of the Master Agreement;

d. Copies of Fiserv's most recent security certifications for the service centers providing services to MWFFCU, as required by § 3(d) of the ASP Services Exhibit to the Master Agreement;

e. Copies of the independent audit reports of the Fiserv service centers providing service to MWFFCU, as required by § 3(f) of the ASP Services Exhibit to the Master Agreement; and

f. Results of Fiserv's tests of its Disaster Recovery Plan, as required by § 5(c) of the ASP Services Exhibit to the Master Agreement.

120. By letter dated November 10, 2025, Fiserv responded to MWFFCU's request for various audit documentation by referring MWFFCU to a previous August 28, 2025, Information Security Plan, while refusing to provide invoice audit documentation required under Section 10(b) "unless and until MWFFCU identifies the specific products and services for which it believes it was improperly invoiced and charged[,]" arguing that a "blanket" request would not be reasonable. MWFFCU's request for invoice audit documentation related to all of the Fiserv products and/or services used by MWFFCU was reasonable, and Fiserv was contractually obligated to fulfill MWFFCU's request under the Master Agreement. A copy of Fiserv's response is annexed hereto as **Exhibit 14**.

121. To date, Fiserv has not provided other documents in response to MWFFCU's audit request.

### *6. MWFFC's Claims Are Timely, as Both the Statute of Limitations and Contractual Limitations Period Have Been Tolled*

122. MWFFCU exercised reasonable diligence but could not discover Fiserv's misconduct earlier due to Fiserv's deliberate and active concealment.[10]

[10] "As the discovery rule has developed, the salient point giving rise to its application is the inability of the injured, despite the exercise of reasonable diligence, to know what he is injured and by what cause." *Bessemer Sys. Fed. Credit Union v. Fiserv Sols., LLC*, 472 F. Supp. 3d 142, 168 (W.D. Pa. 2020) (quoting *Fine v. Checcio*, 582 Pa. 253, 870 A.2d 850, 858 (Pa. 2005)) (denying Fiserv's motion to dismiss the plaintiff credit union's claim as time-barred, relying on the discovery rule).

123. MWFFCU became aware of the harm caused by Fiserv's security deficiencies only recently, well within the applicable limitations period.

124. MWFFCU previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

125. The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

126. Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading MWFFCU.

127. In addition, Fiserv's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

128. Fiserv was actually aware of the material defects in its systems, and its failure to comply with regulatory and contractual requirements. Fiserv also knowingly, affirmatively, and actively concealed from MWFFCU the risks associated with the defects in its products and services, and that those defects caused damages and harm to MWFFCU.

129. Fiserv's purpose in concealing these facts was to induce MWFFCU to continue relying on its services and to delay MWFFCU's discovery of its claims. By concealing material information, Fiserv sought to avoid early detection of its misconduct and to prevent MWFFCU from initiating legal action within the applicable limitations period.

130. Fiserv committed tortious and/or fraudulent acts that continue to this day. As of the date of this Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made about the security of its services are false. Despite its knowledge of the defects and their attendant

risks, Fiserv continues to market its products and services to financial institutions while simultaneously omitting the disclosure of known and foreseeable harms.

131. MWFFCU was unaware and could not have reasonably known or learned through reasonable diligence that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

132. Moreover, Fiserv's obligations under the Master Agreement are ongoing and include the continued implementation of appropriate information security measures, adherence to regulatory requirements, and the exercise of good faith and fair dealing in not exposing MWFFCU to vastly greater harm than bargained for and well outside commercially reasonable norms. Each act of non-compliance with these contractual obligations renewed the limitations period under the continuing duty doctrine.

133. For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose, or other time-based defenses in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule, the continuing duty doctrine, and by Fiserv's active concealment with respect to all claims against it.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract: Monetary Damages**
**(Against Fiserv Solutions Only)**

134. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

135. The Master Agreement is a valid contract binding Fiserv Solutions.

136. In addition to the express terms of the Master Agreement, the implied covenant of good faith and fair dealing applies to the Master Agreement. To vindicate the parties' apparent intentions and reasonable expectations, Fiserv Solutions was obligated to invoice MWFFCU only for services actually and properly performed and to provide security appropriate for a federally regulated credit union that stores extraordinarily sensitive consumer financial information.

137. MWFFCU has duly performed all obligations and satisfied all conditions required of it under the Master Agreement, except for those that were waived or excused by Fiserv Solutions.

138. Fiserv Solutions has repeatedly and materially breached the Master Agreement, including by:

a. violating Section 3(b) of the Master Agreement by failing to use the same care and discretion to prevent unauthorized disclosure of MWFFCU's confidential information as Fiserv uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law;

b. violating Section 4(a) of the Master Agreement by failing to implement and maintain an information security program that appropriately protects the security and confidentiality of MWFFCU's information;

c. violating Section 4(a), 4(b), 10(a), and 10(b) of the Master Agreement, and Sections 3(d), 3(f) and 5(c) of the ASP Services Exhibit to the Master Agreement, by failing to provide the documentation required to be produced to MWFFCU;

d. violating Section 6(a)(iii) of the Master Agreement, by failing to comply with all regulatory requirements;

e. violating Section 10(b) of the Master Agreement by refusing to provide MWFFCU with documentation supporting the amounts invoiced by Fiserv;

f. violating Section 3(e) of the ASP Services Exhibit to the Master Agreement, including the warranties of conformity to specifications and due care;

g. violating Section 6 of the Fiserv Privacy Notice, by failing to implement appropriate security measures to prevent unauthorized access, use, and disclosure of personal data;

h. repudiating its obligations, including by discontinuing Enhanced Authentication services mid-contract and insisting that MWFFCU agree to additional and different contract terms and pay additional charges for "SecureNow" or other ostensible security upgrades that Fiserv is under a preexisting contractual duty to provide; and

i. violating the implied covenant of good faith and fair dealing by issuing invoices for services not properly performed and exposing MWFFCU to hacking and fraud risks vastly greater than it had bargained for and well outside of commercially reasonable norms.

139. Fiserv Solutions' contract breaches were, at a minimum, grossly negligent. Fiserv had actual knowledge, through reports from financial institutions and others, that Fiserv's security controls were absent or woefully inadequate and have led to significant fraud losses and hacking

at other financial institutions. Fiserv Solutions, however, failed to properly investigate or secure its systems. Nor did Fiserv Solutions alert MWFFCU of the security problems. Fiserv Solutions' contract breaches smack of intentional wrongdoing and evince a reckless indifference to MWFFCU's rights.[11]

140. Fiserv Solutions' misconduct was not an isolated incident; it is part of a dangerous pattern that puts life savings and extraordinarily sensitive financial information of scores of consumers into the reach of hackers. By withholding basic safeguards from MWFFCU's systems despite known hacking risks, Fiserv exposed thousands of consumers to hacking, fraud, and identity theft. And MWFFCU is not alone: Fiserv's deficient approach to cybersecurity for its clients has also endangered countless other financial institutions and their customers. Fiserv's misconduct is actionable as an independent tort as well as egregious, repeated, and directed at MWFFCU as part of a broader course of conduct that endangers the public. Fiserv's misconduct reflects a high degree of moral turpitude and such wanton dishonesty as to imply a criminal indifference to Fiserv's civil obligations. Punitive damages are appropriate to deter Fiserv from endangering others in the same way again.

141. As a direct and proximate result of Fiserv Solutions' contract breaches, MWFFCU has suffered and will continue to suffer damages and harm.

---

[11] New York law governs the Master Agreement. New York public policy bars parties from contracting away liability for gross negligence, even in business-to-business contracts signed by sophisticated parties. The limitation-of-liability clause in the Master Agreement therefore offers Fiserv no protection because its failure to fulfill its obligation to secure MWFFCU was, at a minimum, grossly negligent. In *Abacus Federal Savings Bank v. ADT Security Services, Inc.*, 967 N.E.2d 666, 670 (N.Y. 2012), New York's highest court held that a financial institution could recover full, uncapped damages from a security vendor whose gross negligence left the institution insecure. Fiserv's misconduct here is no less grave. The same principle applies, and the damages here are not subject to any contractual cap.

**SECOND CLAIM FOR RELIEF**
**Rescission[12]**
**(Against Fiserv Solutions Only)**

142. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

143. MWFFCU may have the Master Agreement rescinded due to Fiserv's breaches. Fiserv's breaches are so material, willful, substantial, and fundamental that they have defeated the object of the parties in making the Master Agreement. These breaches have left MWFFCU in a position substantially different from what the parties intended at the time they entered into the Master Agreement.

144. MWFFCU may have the Master Agreement rescinded because Fiserv misrepresented to MWFFCU the existence and nature of Fiserv's security controls. These representations were material to MWFFCU, and it reasonably relied on them in deciding whether to enter into and continue performing under the Master Agreement, which did not disclaim reliance on these types of specific representations, and the falsity of Fiserv's representations was within Fiserv's peculiar knowledge and could not have been reasonably discovered by MWFFCU.

145. MWFFCU may have the Master Agreement rescinded due to commercial impracticability and frustration of purpose because unforeseeable events not caused by MWFFCU have altered the essential nature of the Master Agreement, and MWFFCU has been unable to obtain its expected bargain from Fiserv.

146. MWFFCU has no adequate remedy at law. Accordingly, this Court should rescind the Master Agreement.

---

[12] As permitted by Fed. R. Civ. P. 8(a)(3), MWFFCU is demanding different types of relief, including in the alternative, on its claims.

**THIRD CLAIM FOR RELIEF**
**Breach of Contract: Specific Performance**
**(Against Fiserv Solutions Only)**

147. MWFFCU repeats and re-alleges the allegations set forth in the foregoing paragraphs as if fully set forth here.

148. The Master Agreement is a valid contract binding Fiserv Solutions.

149. MWFFCU has performed or substantially performed its obligations under the Master Agreement, except for those, if any, that were waived or excused by Fiserv Solutions.

150. MWFFCU is ready, willing, and able to perform its remaining obligations until the contract terminates or is rescinded by an order of this Court.

151. Fiserv Solutions is presently breaching, and absent relief will continue to breach, its contractual obligations to safeguard MWFFCU's confidential information.

152. Fiserv Solutions has repudiated the Master Agreement, and absent relief will continue to breach the Master Agreement, by withdrawing security offerings provided under the Master Agreement and compelling MWFFCU to accept new service offerings (such as "SecureNow"), at increased prices, in order for Fiserv to continue performing its preexisting duty to safeguard MWFFCU's confidential information.

153. Fiserv is capable of performing the Master Agreement, including by deploying phishing-resistant, possession-based MFA and other enhanced security controls that it uses to safeguard its own sensitive data.

154. The loss of confidentiality and risk of unauthorized access constitute irreparable harms not adequately compensable by money damages alone.

155. Accordingly, the Court should issue an order of specific performance compelling Fiserv Solutions to specifically perform its obligations to MWFFCU, including securing MWFFCU's confidential information as required by the Master Agreement.

**FOURTH CLAIM FOR RELIEF**
**Declaratory Relief**
**(Against Fiserv Solutions Only)**

156. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

157. Genuine disputes exist between the parties concerning the Master Agreement and its existence, meaning, enforceability, and applicability. This Court's declarations of the parties' rights would resolve the legal relations of the parties to justiciable controversies.

158. **No Obligation to Pay for or Contract for "SecureNow" (Preexisting Contractual Duty; Inadequate Security)**. MWFFCU seeks a declaration that it has no obligation to enter into any agreement for Fiserv's "SecureNow" service. Under the Master Agreement, Fiserv bears a preexisting duty to safeguard MWFFCU'S information in accordance with governing contractual and regulatory standards. Fiserv may not condition its performance of that duty on MWFFCU'S agreement to new or different contractual terms or on the payment of additional fees. MWFFCU further seeks a declaration that Fiserv's "SecureNow" product does not satisfy Fiserv's existing contractual and regulatory obligations to appropriately protect MWFFCU'S information.

159. **Unenforceability of Master Agreement's Exculpatory and Limitation-of-Liability Provisions (Public Policy)**. MWFFCU is entitled to a declaration that the exculpatory and limitation-of-liability provisions in the Master Agreement are unenforceable because they purport to allow Fiserv to exempt itself from liability for damages caused by its grossly negligent,

intentional, fraudulent, tortious, or other conduct for which an exculpatory provision or a limitation-of-liability provision is against public policy.

160. **No Obligation to Pay Future Invoices.** MWFFCU disputes any obligation to pay any future invoices on the grounds that:

a. Fiserv's material breaches and repudiation excuse further performance by MWFFCU;

b. Fiserv's failure of consideration discharges MWFFCU's payment obligations;

c. Fiserv's prior material breach and repudiation bars enforcement of the Master Agreement's payment provisions; and

d. The Master Agreement is subject to rescission.

161. **No Obligation to Pay Early Termination Fees, Liquidated Damages, Deconversion, or Post-Termination Fees (Contract Defenses and Public Policy)**. MWFFCU is entitled to declarations that it has no obligation to pay Fiserv early termination fees, liquidated damages, "deconversion," or other post-termination fees because of the following:

a. Fiserv has no right to enforce the Master Agreement due to its material breaches, fraudulent performance, failure of consideration, commercial impracticability, and frustration of purpose.

b. The fees at issue, other than liquidated damages, are not quantified in the Master Agreement and therefore unenforceable under the doctrine of indefiniteness and because they are not reasonable.

c. The early termination fees or liquidated damages provisions are unenforceable penalties because they purport to entitle Fiserv to payment without regard to Fiserv's own wrongful conduct, and without regard to the substantial independent

reasons why MWFFCU may seek to terminate the Master Agreement to ensure its members are properly protected. The only legitimate purpose of such provisions would be to compensate for actual harm that is difficult to quantify. But if such provisions coerce action or punish—as they do here—they are unenforceable penalties. The plain purpose of these provisions is to coerce MWFFCU into maintaining its relationship with Fiserv. Moreover, even if these provisions are not unenforceable penalties, to the extent Fiserv relies on them for indemnification or recovery of amounts incurred as a result of its own wrongful acts, such provisions are unenforceable under New York law.

## FIFTH CLAIM FOR RELIEF
**Unjust Enrichment**
**(Against Fiserv Solutions Only)**

162. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

163. Fiserv Solutions induced MWFFCU to pay it by issuing invoices. These invoices, delivered on a recurring basis, conveyed expressly and by implication that the invoiced services had been properly performed and that the invoiced amounts were owed to Fiserv Solutions.

164. In reality, Fiserv Solutions had not performed as promised. Fiserv Solutions' invoices overstated the amounts MWFFCU owed, and Fiserv Solutions withheld material facts about the security deficiencies in its systems. Fiserv Solutions' systems were so insecure that they were not even minimally suitable for storing a regulated credit union's confidential information.

165. As a result of this misconduct, MWFFCU mistakenly conferred a benefit on Fiserv Solutions in the form of payments for deficient or non-performed services.

166. Fiserv Solutions was unjustly enriched by those payments. Equity and good conscience require Fiserv Solutions disgorge and make restitution of the amounts MWFFCU paid, with interest.

**SIXTH CLAIM FOR RELIEF**
**Defend Trade Secrets Act**
**(18 U.S.C. § 1836, *et seq*.)**

167. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

168. MWFFCU is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. MWFFCU's trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

169. MWFFCU's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

170. Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

171. MWFFCU has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement, Fiserv's Privacy Notice, and in accordance with the policies, procedures, and commitments announced by Fiserv.

172. MWFFCU has invested substantial resources in developing and protecting its trade secrets. MWFFCU's trade secrets provide it with economic advantages over its competitors.

173. Fiserv knew or should have known that MWFFCU's information at issue comprised MWFFCU's trade secrets.

174. Fiserv misappropriated and continued to misappropriate MWFFCU's trade secrets by acquiring and continuing to acquire them through improper means, including by misrepresenting to MWFFCU the existence and nature of Fiserv's security controls. Had Fiserv provided truthful information to MWFFCU, it would not have furnished its trade secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on Fiserv's insecure systems.

175. At the time of Fiserv's use and disclosure of MWFFCU's trade secrets, Fiserv knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to MWFFCU to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

176. Fiserv's misappropriation of MWFFCU's trade secrets was done for its own commercial advantage, allowing Fiserv to obtain and retain excessive payments from MWFFCU.

177. Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

178. Fiserv's misappropriation was willful and malicious, entitling MWFFCU to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

179. As a direct and proximate result of Fiserv's misappropriation of MWFFCU's trade secrets, MWFFCU has suffered and will continue to suffer damages and harm.

**<u>SEVENTH CLAIM FOR RELIEF</u>**
**Fraud**

180. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

181. Fiserv fraudulently misrepresented its data security practices and knowingly concealed their profound deficiencies. Relying on these deceptive assurances, MWFFCU entrusted Fiserv with highly sensitive confidential information, a trust Fiserv intentionally violated.

182. As set forth above, Fiserv fraudulently misrepresented the existence and nature of the security controls that were in place to protect MWFFCU's confidential information.

183. As set forth above, Fiserv also fraudulently represented its performance and intention to perform under the Master Agreement, including by withdrawing security features mid-contract and forcing upgrades to "SecureNow."

184. Likewise, statements in Fiserv's *SOC Report* were false and misleading when made. At the time Fiserv furnished the *SOC Report* to MWFFCU, Fiserv had not aligned its cybersecurity standards and practices with the representations in the *SOC Report*, including the NIST framework. Nor is the Fiserv cybersecurity program built on the NIST framework. Moreover, and as further explained below, Fiserv does not comply with the NIST framework, including all associated updates.

185. Fiserv compounded these misrepresentations by furnishing the *SOC Report* to MWFFCU as independent assurance of the adequacy of its security controls, while failing to disclose material conflicts of interest — including a four-decade institutional relationship between Fiserv and its ostensibly independent auditor, and personnel overlap between Fiserv's Chief Risk Officer and auditing firm — that undermined the independence, objectivity, and reliability of the audit on which Fiserv's representations depended.

186. Fiserv also fraudulently represented its "Enhanced Authentication" service to MWFFCU. As set forth above, "Enhanced Authentication" fails to provide MFA that meets baseline standards for authentication.

187. Statements in the *Fiserv Cybersecurity Fact Sheet 2025* further fraudulently represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

188. Moreover, Fiserv's failure to implement multi-factor authentication constitutes both fraud and fraudulent misrepresentation. By accepting payment for security services it had no intention of providing, Fiserv deliberately deceived MWFFCU about the actual level of protection afforded to its confidential information. Fiserv intentionally and willfully defrauded MWFFCU while placing thousands of MWFFCU's members at risk.

189. Even after being directly confronted about this fraud, Fiserv continues its deception. On September 19, 2025, counsel for MWFFCU sent a demand letter to Fiserv explicitly identifying the failure to implement two-factor authentication despite receiving payment for such services. *See* **Exhibit 13**. Rather than implementing the promised security measures, Fiserv responded by disputing its breach. *See* **Exhibit 14**. Fiserv then pivoted, insisting on "sunsetting" its existing authentication protocol and demanding that MWFFCU implement another deficient product, "SecureNow," and pay more for the privilege.

190. Fiserv's continued failure to provide multi-factor authentication after being put on notice of this issue demonstrates the fraudulent nature of the original transaction. A company acting

in good faith would have immediately implemented the security measures upon discovering an oversight. Instead, Fiserv's response confirms that its original acceptance of payment without even intending to hold its end of the bargain was intentional.

191. Further, independent of any specific misrepresentations made by Fiserv, MWFFCU reasonably and justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality of MWFFCU's information and MWFFCU is entitled to presume, and did expect, that Fiserv would take appropriate measures to keep its information safe. Fiserv did not disclose at any time to MWFFCU that its information was vulnerable to hackers because Fiserv's security was inadequate. Fiserv was the only one in possession of that material information, which it had a duty to disclose. Fiserv misrepresented, both by affirmative conduct and by omission, the security of its systems, their ability to authenticate authorized users, their ability to safely store and process MWFFCU's information, and the security measures and services that have been provided to MWFFCU. Fiserv also engaged in deception by actively concealing (a) Fiserv's failure to implement reasonable and appropriate security measures, (b) Fiserv's failure to follow industry standards and regulatory guidelines for data security; (c) information about Fiserv's security problems (including by threatening another Fiserv customer who uncovered a security problem through litigation); and (d) Fiserv's failure to comply with its own policies, notices, and agreements. MWFFCU justifiably relied on Fiserv, which had a duty to disclose material facts that would undermine MWFFCU's reasonable reliance on these subjects. Fiserv has special knowledge of information regarding these subjects that is not reasonably ascertainable by MWFFCU.

192. MWFFCU reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions to its detriment by, among other things, entering into the Master

Agreement and other transactions with Fiserv, making payments to Fiserv, and furnishing confidential information to Fiserv.

193. Fiserv knew or should have known that its misrepresentations, concealments, acts, and omissions were false or recklessly made without regard to their falsity, were material to MWFFCU, and were made with the intent of misleading MWFFCU into relying upon them, and MWFFCU did so justifiably rely. Further, the falsity of Fiserv's misrepresentations, concealments, acts, and omissions was within Fiserv's peculiar knowledge and could not have been reasonably discovered by MWFFCU.

194. By Fiserv's misrepresentations, concealments, acts, and omissions, Fiserv defrauded MWFFCU, including fraudulently inducing MWFFCU to contract with, and continue to receive services from, Fiserv.

195. As a direct and proximate result of Fiserv's fraud, MWFFCU has suffered and will continue to suffer damages and harm.

## JURY TRIAL DEMAND

MWFFCU requests a trial by jury of all issues so triable.

## DEMAND FOR RELIEF

WHEREFORE, MWFFCU respectfully requests that the Court enter final judgment on the Complaint in favor of MWFFCU and against Fiserv and grant the following relief:

(i) **Monetary damages**, including, without limitation, restitutionary, compensatory, consequential, incidental, reliance, statutory, and punitive—all in amounts to be determined at trial.

(ii) **Rescission of the Master Agreement**, unwinding the parties' relationship;

(iii) **Restitution and disgorgement**, restoring MWFFCU to the status quo ante, including, without limitation, recovery of amounts MWFFCU paid to Fiserv under the Master Agreement for services that were materially deficient, nonconforming, or rendered valueless by Fiserv's breaches and repudiation;

(iv) **Indemnification** of MWFFCU's losses;

(v) **Declaratory relief** declaring the parties' respective rights and obligations in connection with the Master Agreement;

(vi) **Specific performance** compelling Fiserv to perform its obligations to MWFFCU, including properly safeguarding MWFFCU's confidential information;

(vii) **Preliminary and permanent injunctive relief** protecting MWFFCU against additional harm;

(viii) **Costs of litigation**, including, without limitation, MWFFCU's attorneys' fees and costs, and the maximum pre-judgment and post-judgment interest allowed by law; and

(ix) **Any further relief** that may be necessary to achieve justice.

Dated: May 21, 2026

Respectfully submitted,

*<u>/s/ Kathleen A. DeLaney</u>*
Kathleen A. DeLaney (# 18604-49)
DeLaney & DeLaney LLC
3646 Washington Boulevard
Indianapolis, IN 46205
317-920-0400
kathleen@delaneylaw.net

Charles J. Nerko*
John C. Cleary*
Walter E. Swearingen*
**NERKO PLLC**

1178 Broadway, 3rd Floor
New York, NY 10001
518.363.9100
cnerko@nerko.com
jcleary@nerko.com
wswearingen@nerko.com

Lori G. Feldman*
David H. Hecht*
Tiffany Wong*
**HECHT PARTNERS LLP**
125 Park Avenue, 25th Floor
New York, New York 10017
lfeldman@hechtpartners.com
dhecht@hechtpartners.com
twong@hechtpartners.com
888.421.4529

Kristen L. Nelson*
**HECHT PARTNERS LLP**
2121 Avenue of the Stars, Suite 800
Los Angeles, California 90067
212.851.6821
knelson@hechtpartners.com

*Attorneys for Plaintiff*
*Midwest Family Federal Credit Union*

**Pro hac vice application forthcoming*