**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | |
|---|---|
| MIDWEST FAMILY FEDERAL CREDIT UNION,<br><br>*Plaintiff*,<br><br>v.<br><br>FISERV SOLUTIONS, LLC f/k/a FISERV SOLUTIONS, INC., and FISERV, INC.,<br><br>*Defendants*. | Case No. 2:26-CV-00234 |

**DEFENDANTS FISERV SOLUTIONS, LLC AND FISERV, INC.'S ANSWER TO FIRST AMENDED COMPLAINT**

Defendants Fiserv Solutions, LLC f/k/a Fiserv Solutions, Inc. ("Fiserv") and Fiserv, Inc. (collectively, the "Defendants") hereby answer the First Amended Complaint of Plaintiff Midwest Family Federal Credit Union ("Midwest") as follows:

1. MWFFCU is a not-for-profit credit union. Fiserv, one of the world's largest providers of outsourced technology to financial institutions, sold itself to MWFFCU as a trusted custodian of the most sensitive data a financial institution can hold: consumers' transaction histories, account numbers, and personal information.

**ANSWER**: Admit that Midwest is a not-for-profit credit union; admit that Fiserv is a provider of outsourced technology to financial institutions; admit that Fiserv stores and processes data of its financial institution clients; except as so stated, deny the allegations of Paragraph 1.

2. MWFFCU brings this action and seeks relief to prevent ongoing and irreparable harm caused by Fiserv's deficient and misrepresented cybersecurity practices. Fiserv falsely

represents that it employs appropriate safeguards to protect the sensitive and confidential financial data of MWFFCU credit union members. Fiserv has failed to implement basic, industry standard controls, leaving MWFFCU's systems and member information vulnerable to unauthorized access.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Midwest's allegation with respect to what Midwest's lawsuit seeks and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 2, specifically denying that Defendants made any false representations to Midwest, failed to implement appropriate controls, or that Midwest's member information is vulnerable.

3. These risks are not hypothetical – they are present and continuing.

**ANSWER**: Deny the allegations of Paragraph 3.

4. Under its Master Agreement, Fiserv pledged to protect MWFFCU's data with the same high-tech safeguards Fiserv uses for its own information and in full compliance with federal standards. But the reality was starkly different. Fiserv sold and operated systems that were so insecure that no regulated financial institution should have been asked to run its confidential data through them. Fiserv's systems lack basic security controls. They easily expose consumer data. And Fiserv kept selling them—while falsely assuring MWFFCU and its other financial institution customers that everything was secure.

**ANSWER**: Deny the allegations of Paragraph 4.

5. Fiserv's double standard makes its breaches unmistakable. For its own corporate data, Fiserv deploys layered, possession-based multi-factor authentication (MFA), token generators, and biometric controls. For MWFFCU's systems, Fiserv withheld these protections. Instead, it relied on authentication methods so weak and susceptible to hacking that federal standards expressly do not permit their use.

**ANSWER**: Admit that Defendants use layered, possession-based multi-factor authentication, including the use of token generators and biometrics for certain types of their corporate data; except as so stated, deny the allegations of Paragraph 5, specifically denying that Fiserv "withheld" any "protections" from Midwest and affirmatively asserting that Fiserv has provided all the security and other products for which Midwest contracted in the Master Agreement.

6. MWFFCU cannot fix these security failures on its own. Fiserv controls the systems that store and process MWFFCU's data. As long as those systems remain inadequately secured, MWFFCU's systems remain unsecured and MWFFCU faces ongoing hacking risks. Each day that passes without proper controls compounds that risk.

**ANSWER**: Deny the allegations of Paragraph 6.

7. Fiserv has converted its own security failures into an upsell opportunity. If MWFFCU seeks to leave and transfer its data to a safer provider, Fiserv would demand seven-figure "early termination" and deconversion fees as the price of release. Fiserv's ultimatum is clear: pay the ransom, or leave your data exposed on systems Fiserv refuses to adequately secure.

**ANSWER**: Admit that the Master Agreement requires Midwest to pay certain fees if Midwest terminates the Master Agreement for any reason other than pursuant to Section 8(b)(i); admit that the Master Agreement requires Midwest to pay certain fees in connection with Midwest's deconversion from Fiserv's products and services; except as so stated, deny the allegations of Paragraph 7.

8. Staying with Fiserv offers no refuge. Acknowledging its own deficiencies, Fiserv announced that it will discontinue its existing "Enhanced Authentication" or "Intelligent Authentication" product and force credit unions to purchase an upgrade marketed as "SecureNow,"

supposedly to provide additional security.

**ANSWER**: Admit that Fiserv has announced that it will discontinue Enhanced Authentication and replace it with SecureNow, which provides additional security capabilities; except as so stated, deny the allegations of Paragraph 8.

9. SecureNow does not solve the problem. It is not secure. It does not comply with federal standards for MFA. It falls far below the standard Fiserv uses to protect its own corporate data. And SecureNow does not address the myriad of other Fiserv systems that are not secure. So, even after paying for the upgrade to SecureNow, a financial institution remains exposed to hacking risks.

**ANSWER**: Deny the allegations of Paragraph 9.

10. In sum, Fiserv has attempted to monetize its own security failures by forcing credit unions to choose between paying to escape unsafe systems or paying again for ostensible security services that do not provide proper protection.

**ANSWER**: Deny the allegations of Paragraph 10.

11. This is Fiserv's business model. According to The Wall Street Journal, Fiserv's misconduct is part of a pattern of victimizing small financial institutions and the consumers they serve. After decades of acquiring other technology providers, Fiserv now dominates the market. Fiserv's strategy is to buy up its smaller competitors to stymie competition. Meanwhile, Fiserv ceases to make the proper financial investments to keep up with emerging technology and security risks—while attempting to lock financial institutions into long-term contracts, attempting to intimidate and silence its customers from disclosing to other affected customers when there are security problems, and holding customers' data hostage when those customers seek to go to competitors. This gambit has fattened Fiserv's profits but exploited small financial institutions and

the customers they serve. *See Frustrated by the Tech Industry, Small Banks Start to Rebel*, THE WALL STREET JOURNAL (April 11, 2019), https://www.wsj.com/articles/small-banks-rebel-against-the-most-important-tech-firms-you-have-never-heard-of-11554975000. Exhibit 1 is a true and correct copy of *The Wall Street Journal* article.

**ANSWER**: Admit that what appears to be a copy of an article from the Wall Street Journal is attached to the First Amended Complaint as Exhibit 1; state that to the extent Paragraph 11 purports to describe, quote, or characterize the attached article, that document speaks for itself; except as so stated, deny the allegations of Paragraph 11, specifically denying that Defendants engaged in any misconduct.

12. MWFFCU brings this action to recover damages and to obtain declaratory and equitable relief that blocks Fiserv's improper exit charges and protects MWFFCU's members.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Midwest's allegations with respect to the reasons that Midwest has filed this lawsuit and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 12, specifically denying that Midwest is entitled to declaratory, equitable, or any other relief.

13. Plaintiff MWFFCU is a federally chartered, not-for-profit credit union with localized operations in Indiana. MWFFCU has a principal place of business at 2832 Willowcreek Rd., Portage, Indiana 46368.

**ANSWER**: On information and belief, admit the allegations of Paragraph 13.

14. Upon information and belief, defendant Fiserv Solutions, LLC, formerly known as Fiserv Solutions, Inc., is a limited liability company organized under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203. Upon

information and belief, Fiserv Solutions is a wholly owned subsidiary of Fiserv, Inc.

**ANSWER**: Admit the allegations of Paragraph 14.

15. Upon information and belief, defendant Fiserv, Inc. is a corporation incorporated under the laws of Wisconsin, with a principal place of business at 600 N. Vel R. Phillips Avenue, Milwaukee, WI 53203.

**ANSWER**: Admit the allegations of Paragraph 15.

16. On information and belief, Defendants Fiserv, Inc. and Fiserv Solutions LLC operate as an integrated enterprise, are agents of each other, and each defendant acted as the agent of the other defendant and within the scope of that agency. Among other things, Defendants maintain the same principal corporate headquarters, share common officers and employees, conduct business through interconnected corporate entities with common business functions and purposes, and communicate with MWFFCU through a common fiserv.com domain name. At all relevant times, Defendants acted through one another, and through their officers, employees, agents, and representatives, in carrying out the conduct alleged herein, and acted with the other defendant's authority, knowledge, consent, and ratification of the conduct alleged herein.

**ANSWER**: Admit that Fiserv, Inc. and Fiserv Solutions, LLC maintain the same principal place of business and that Fiserv has communicated with Midwest through the fiserv.com domain name; except as so stated, deny the allegations of Paragraph 16.

17. This Court has original subject-matter jurisdiction over MWFFCU's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over MWFFCU's state-law claims 28 U.S.C. § 1367(a) because these claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the

United States Constitution.

**ANSWER**: State that the allegations of Paragraph 17 assert a legal conclusion as to which no response is required and, therefore, deny the allegations.

18. This Court also has subject-matter jurisdiction over MWFFCU's claims under 28 U.S.C. § 1332 (diversity) because there is complete diversity of citizenship among the parties given that MWFFCU is a citizen of a different state than either defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER**: State that the allegations of Paragraph 18 assert a legal conclusion as to which no response is required and, therefore, deny the allegations.

19. Venue in this district is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the misconduct occurred in this district, and a substantial part of the property that is the subject of the action is situated in this district.

**ANSWER**: State that the allegations of Paragraph 19 assert a legal conclusion as to which no response is required and, therefore, deny the allegations.

20. This Court has personal jurisdiction over Fiserv because Fiserv operates in this district and/or has contacts with this jurisdiction sufficient to subject it to personal jurisdiction.

**ANSWER**: State that the allegations of Paragraph 20 assert a legal conclusion as to which no response is required and, therefore, deny the allegations.

21. MWFFCU is a not-for-profit, member-owned financial institution serving over 2,500 members in Porter County, Indiana. MWFFCU offers a range of banking and financial services for the Porter County community, including checking accounts, savings accounts and money markets, savings share certificates, individual retirement accounts (IRAs), debit and credit cards, online banking, loan products (such as home loans, car loans, and personal loans), and

business banking. MWFFCU was chartered in 1962, originally to serve the employees of Midwest Steel. With over $39 million in assets and serving thousands of members, MWFFCU is a community-focused and growing financial institution.

**ANSWER**: Admit that Midwest is a credit union and, on information and belief, admit that Midwest offers a range of banking and financial services; except as so stated, state that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 21 and, therefore, deny the allegations.

22. MWFFCU's members include those who live, work, worship, attend school, volunteer, or have business and other legal entities in Porter County; employees of MWFFCU; the immediate family members of existing members; and spouses of deceased members. MWFFCU is a professionally managed financial institution offering personalized service and a wide array of financial services.

**ANSWER**: On information and belief, admit that Midwest's members include those who live, work, worship, attend school, volunteer, or have business and other legal entities in Porter County, employees of Midwest, the immediate family members of existing members, and spouses of deceased members, and that Midwest offers a range of banking and financial services; except as so stated, state that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 22 and, therefore, deny the allegations.

23. Fiserv is among the largest technology vendors to credit unions and banks. It claims approximately 10,000 financial institution clients and provides technology to more than one in three U.S. financial institutions.

**ANSWER**: Admit the allegations of Paragraph 23.

24. MWFFCU contracted with Fiserv to provide technology services under a Master

Agreement dated June 28, 2019, as amended. Exhibit 2 contains true and correct copies of the Master Agreement and the amendments.

**ANSWER**: Admit that Fiserv and Midwest entered into that certain Master Agreement and related addenda, schedules, exhibits, and appendices, dated as of June 28, 2019 (the "Master Agreement"); state that to the extent Paragraph 24 purports to describe, quote, or characterize the Master Agreement, that document speaks for itself; except as so stated, deny the allegations of Paragraph 24.

25. Among the services Fiserv provides are account processing services. An account processing system is the "brains" behind a financial institution, processing and recording all transactions for the financial institution.

**ANSWER**: Admit that Fiserv provides account processing services to its financial institution clients and that account processing systems process and record transactions for financial institutions; except as so stated, deny the allegations of Paragraph 25.

26. Fiserv stores and processes MWFFCU's most sensitive information, including member names, dates of birth, Social Security Numbers, banking account numbers, balances, transaction histories, and other highly sensitive, personally identifying information, across various Fiserv systems.

**ANSWER**: Admit that Midwest uses certain Fiserv products and services to store and process information required for Midwest to operate is business, including names, dates of birth, social security numbers, banking account numbers, balances, and transaction histories; except as so stated, deny the allegations of Paragraph 26.

27. Under the Master Agreement and the incorporated ASP Services Exhibit to the Master Agreement ("ASP Services Exhibit"), Fiserv was required to follow the following

standards of care:

a. Section 3(b) of the Master Agreement requires Fiserv to "use the same care and discretion to prevent unauthorized disclosure of information as it uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law." (Exhibit 2 at § 3(b).)

b. Section 4(a) of the Master Agreement requires Fiserv to implement and maintain an information security program that is designed to meet the following objectives:

   i. "protect the security and confidentiality of customer information;"

   ii. "protect against any anticipated threats or hazards to the security or integrity of such information;"

   iii. "protect against unauthorized access to or use of such information that could result in substantial harm or inconvenience to any customer;" and

   iv. "ensure the proper disposal of 'consumer information.'" (Exhibit 2 at § 4(a).)

c. The Virtual Branch Services Schedule to the ASP Services Exhibit requires Fiserv to provide "Enhanced Authentication," beyond a baseline level of minimally acceptable authentication.

**ANSWER**: State that to the extent Paragraph 27 purports to describe, quote, or characterize the Master Agreement, that document speaks for itself; except as so stated, deny the allegations of Paragraph 27, including the allegations of subparagraphs (a), (b), and (c) and Footnote 1.

28. Fiserv protects its own confidential data with robust, high-assurance measures, including token-generated codes, biometric identifiers, and other layered authentication controls,

in addition to phishing-resistant multi-factor authentication.

**ANSWER**: Admit that Defendants employ robust security measures to protect their confidential data, including through multi-factor authentication utilizing tokens and biometrics, phishing-resistant multi-factor authentication, and other layered authentication controls; except as so stated, deny the allegations of Paragraph 28.

29. Fiserv consistently touted its commitment to robust security protocols in the materials that it provided to MWFFCU and its other financial institution customers. Fiserv posts documentation about its security on a client file-sharing portal accessible to MWFFCU and other Fiserv customers. For example, *Fiserv's Cybersecurity Fact Sheet 2025, Standard Information Gathering Questionnaire*, and *SOC 1 Type 2 Report* assert that Fiserv employs a robust cybersecurity program, including the implementation of MFA as part of its security strategy. These documents outline Fiserv's commitment to industry standards and regulatory requirements, including National Institute of Standards and Technology ("NIST") and International Organization for Standardization ("ISO") frameworks.

**ANSWER**: Admit that Fiserv provides certain documentation about its security through a client file-sharing portal; state that to the extent Paragraph 29 purports to describe, quote, or characterize the referenced Cybersecurity Fact Sheet 2025, Standard Information Gathering Questionnaire, and SOC 1 Type 2 Report, those documents speak for themselves and should each be considered as a whole; except as so stated, deny the allegations of Paragraph 29, including the allegations of Footnote 2.

30. Fiserv's *Cybersecurity Fact Sheet 2025* (a true copy of which is annexed hereto as Exhibit 3) states that Fiserv "has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications . . . . The

policy and supporting standards have been designed to meet applicable industry and regulatory requirements, including . . . National Institute of Standards and Technology (NIST) Cyber Security Framework, 800-53, 800-63-3." (Exhibit 3 at 3.).

**ANSWER**: State that to the extent Paragraph 30 purports to describe, quote, or characterize the referenced Cybersecurity Fact Sheet, that document speaks for itself and should be considered as a whole; except as so stated, deny the allegations of Paragraph 30.

31. In Fiserv's *Standard Information Gathering Questionnaire* (a true copy of which is annexed hereto as Exhibit 4), Fiserv was asked "Is Multi-Factor Authentication (MFA) utilized?" Fiserv responded, "Yes." (Exhibit 4 at row H.4.)

**ANSWER**: State that to the extent Paragraph 31 purports to describe, quote, or characterize the referenced Standard Information Gathering Questionnaire, that document speaks for itself and should be considered as a whole; except as so stated, deny the allegations of Paragraph 31.

32. As described in the *SOC 1 Type 2 Report: Fiserv Enterprise Technology* (a true copy of which is annexed hereto as Exhibit 5), Fiserv requires its employees accessing Fiserv's systems to use "two-factor authentication that includes a token-generated one-time code." (Exhibit 5 at 130.)

**ANSWER**: State that to the extent Paragraph 32 purports to describe, quote, or characterize the referenced SOC 1 Type 2 Report, that document speaks for itself and should be considered as a whole; except as so stated, deny the allegations of Paragraph 32.

33. As discussed in further detail below, Fiserv failed to implement compliant multi-factor authentication or "MFA", among other things. As a result, Fiserv breached the Master Agreement and rendered its various assurances false and misleading.

**ANSWER**: Deny the allegations of Paragraph 33.

34. MFA is an additional security control that counters the most common hacking vector, a compromised password, by requiring two or more distinct factors: something the user knows (such as a password), possesses (such as a device or token), or is (such as a biometric verification). MFA makes an account 99% less likely to be hacked.

**ANSWER**: Admit that multi-factor authentication is a security control that consists of two or more distinct factors for authentication and is used to counter hacking; state that to the extent Paragraph 34 purports to describe, quote, or characterize contents of the referenced website, that website speaks for itself; except as so stated, deny the allegations of Paragraph 34.

35. Not all MFA provides equal security. Some forms, such as codes sent by email or text, do not qualify as MFA because they fail to establish possession of a particular device. Those forms provide inadequate security because they are susceptible to hacking by interception, SIM-swap, or account takeover.

**ANSWER**: Admit that there are different forms of multi-factor authentication with different features; except as so stated, deny the allegations of Paragraph 35.

36. Federal standards and supervisory guidance reinforce these differences. Codes sent by text message are not secure. The United States Cybersecurity and Infrastructure Security Agency describes text message codes as a "last resort MFA option" and appropriate only as a "temporary solution when organizations transition to a stronger MFA implementation." *See Implementing Phishing-Resistant MFA*, at 2-3 (a true copy of which is annexed hereto as Exhibit 6). This is because it is fairly simple to intercept or redirect text messages, so a text message code is insufficient to satisfy the "what you have" factor by establishing possession of a particular device.

**ANSWER**: State that to the extent Paragraph 36 purports to describe, quote, or characterize

contents of the referenced article, that article speaks for itself; except as so stated, deny the allegations of Paragraph 36.

37. The Federal Financial Institutions Examination Council's *Authentication and Access to Financial Institution Services and Systems* references and incorporates the Digital Identity Guidelines of NIST, which mandates: "Methods that do not prove possession of a specific device, such as . . . email, SHALL NOT be used for out-of-band authentication." *See* NIST SP 800-63B § 5.1.3.1.5 A true copy of *Digital Identity Guidelines* is annexed hereto as Exhibit 7. This further requires that "[i]n the absence of a trusted statement that it is a multi-factor device, the verifier SHALL treat the authenticator as single-factor." *Id.* § 5.1.5.2.

**ANSWER**: State that to the extent Paragraph 37 purports to describe, quote, or characterize contents of the referenced FFIEC and NIST materials, those materials speak for themselves; except as so stated, deny the allegations of Paragraph 37.

38. A July 2025 update to NIST's *Digital Identity Guidelines* (a true copy of which is annexed hereto as Exhibit 8) reinforces that codes sent by email are insufficient to provide proper MFA: "Email SHALL NOT be used for out-of-band authentication because it may be vulnerable to:

- Access using only a password
- Interception in transit or at intermediate mail servers
- Rerouting attacks, such as those caused by Domain Name System (DNS) spoofing."

**ANSWER**: State that to the extent Paragraph 38 purports to describe, quote, or characterize contents of the referenced NIST materials, those materials speak for themselves; except as so stated, deny the allegations of Paragraph 38.

39. Similarly, the Center for Internet Security ("CIS") states that phishing-resistant MFA methods (i.e., not email or SMS) are required for high-risk users and high-security environments.

**ANSWER**: State that to the extent Paragraph 39 purports to describe, quote, or characterize contents of the referenced website, that website speaks for itself; except as so stated, deny the allegations of Paragraph 39.

40. CISA, CIS, and NIST standards are routinely referenced by the FFIEC and NCUA, and many of their standards are incorporated into NCUA guidance, examination procedures, and regulations. Section 501(b) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. §§ 6801-6809, tasks financial regulators (relevant here, the NCUA) with establishing administrative, technical, and physical safeguards for member records.

**ANSWER**: State that to the extent Paragraph 40 purports to describe, quote, or characterize contents of the referenced FFIEC press release and the Gramm-Leach-Bliley Act, that content speaks for itself; except as so stated, deny the allegations of Paragraph 40.

41. Pursuant to the GLBA, the NCUA enacted Guidelines for Safeguarding Member Information, 12 C.F.R. Part 748, Appendix A, which mandates that federally insured credit unions (such as MWFFCU) implement measures to protect the security, confidentiality, and integrity of consumers' personal information.

**ANSWER**: State that to the extent Paragraph 41 purports to describe, quote, or characterize contents of 12 C.F.R. Part 748, Appendix A, those materials speak for themselves; except as so stated, deny the allegations of Paragraph 41.

42. Specifically, credit unions are required to implement "access controls on member information systems, including controls to authenticate and permit access only to authorized

individuals and controls to prevent employees from providing member information to unauthorized individuals who may seek to obtain this information through fraudulent means." Further, credit unions must "exercise appropriate due diligence in selecting its service providers; require its service providers by contract to implement appropriate measures designed to meet the objectives of these guidelines; and where indicated by the credit union's risk assessment, monitor its service providers to confirm that they have satisfied their obligations." This language reflects that in the ASP Services Exhibit that "functionality provided by the Fiserv System will enable Client to comply in all material respects with Federal regulations generally applicable to Fiserv's clients in the industry[.]" (Exhibit 2 at 10).

**ANSWER**: State that to the extent Paragraph 42 purports to describe, quote, or characterize contents of 12 C.F.R. Part 748, Appendix A and the Master Agreement, those materials speak for themselves; except as so stated, deny the allegations of Paragraph 42.

43. Part 748 explicitly recognizes that the security environment is constantly evolving and requires updating: "Each credit union should monitor, evaluate, and adjust, as appropriate, the information security program in light of any relevant changes in technology, the sensitivity of its member information, internal or external threats to information . . . ." In addition, credit unions must consider "the identified risks, commensurate with the sensitivity of the information as well as the complexity and scope of the credit union's activities" in this changing environment.

**ANSWER**: State that to the extent Paragraph 43 purports to describe, quote, or characterize contents of 12 C.F.R. Part 748, Appendix A, those materials speak for themselves; except as so stated, deny the allegations of Paragraph 43.

44. The NCUA ensures that credit unions are complying with federal regulations and best practices through references to external frameworks. The NCUA's Information Security

Examination ("ISE") program, which refers to Part 748 among other federal regulations, "reference[s] industry security standards and frameworks from NIST and the Center for Internet Security, and CISA." The NCUA's ISE and cybersecurity assessment programs also incorporate the FFIEC IT Handbook's *Information Security and Outsourcing Technology Services* booklets, which references NIST and CIS standards. And as discussed above, the FFIEC references NIST, CISA, and CIS standards. These security guidelines are the framework that the NCUA uses to ensure credit union compliance with Part 748.

**ANSWER**: State that to the extent Paragraph 44 purports to describe, quote, or characterize contents of the referenced NCUA materials, those materials speak for themselves; except as so stated, deny the allegations of Paragraph 44.

45. Additionally, the NCUA offers credit unions the Automated Cybersecurity Evaluation Toolbox ("ACET"), a voluntary tool that allows credit unions to "determine and measure their own cybersecurity preparedness over time."10 The ACET tool explicitly incorporates "cybersecurity assessment tools from [CISA], Center for Internet Security (CIS), and [NIST]."

**ANSWER**: State that to the extent Paragraph 45 purports to describe, quote, or characterize contents of the referenced NCUA materials, those materials speak for themselves; except as so stated, deny the allegations of Paragraph 45.

46. The NCUA uses the NIST SP 800-53 and NIST Risk Management Framework to protect its own data, and expressly references NIST, CISA, and other external standards as those that it is bound to follow.

**ANSWER**: State that to the extent Paragraph 46 purports to describe, quote, or characterize contents of the referenced NCUA and NIST materials, those materials speak for themselves;

except as so stated, deny the allegations of Paragraph 46.

47. Despite these contractual and regulatory obligations that adopted industry standards such as NIST, CIS, and CISA, Fiserv failed to implement these necessary protections for MWFFCU's confidential information. Instead, Fiserv deployed materially weaker controls than what it used for its own similar information—controls that fell below the industry and regulatory standard.

**ANSWER**: Deny the allegations of Paragraph 47.

48. Fiserv does not properly implement or enforce MFA on multiple systems used to store MWFFCU's information.

**ANSWER**: Deny the allegations of Paragraph 48.

49. On at least one system housing MWFFCU's confidential information, Fiserv has not required any MFA or email passcode challenge at all.

**ANSWER**: Admit that not every product and service Midwest contracted to receive under the Master Agreement required multi-factor authentication or an email passcode challenge; except as so stated, deny the allegations of Paragraph 49.

50. For other systems housing MWFFCU's confidential information, Fiserv relied on an email passcode challenge instead of MFA. Email does not establish possession of a specific device and does not qualify as a second factor under federal regulatory guidance. Nor does Fiserv use this weak method to secure its own confidential information. It therefore fails to meet the standard of care Fiserv owes MWFFCU under the Master Agreement.

**ANSWER**: Admit that certain products and services Midwest contracted to receive under the Master Agreement utilize one-time passcodes sent via email; except as so stated, deny the allegations of Paragraph 50.

51. On other access paths, Fiserv uses codes sent over text message. Text message codes are insufficient to satisfy the possession factor of MFA. At best, as the above federal regulatory guidance explains, text message codes are a temporary bridge to stronger, phishing-resistant MFA. Fiserv deploys stronger possession-based MFA such as token- or app-based authenticators to protect Fiserv's own confidential information but has failed to provide equivalent protections to MWFFCU.

**ANSWER**: Admit that certain products and services Midwest contracted to receive under the Master Agreement utilize one-time passcodes sent via text message; except as so stated, deny the allegations of Paragraph 51.

52. Not only does the lack of possession-based MFA fail to meet equivalent standards employed by Fiserv on its own data, but it also fails to meet the "reasonable standard of care" under Section 3(b). This breaches the Master Agreement.

**ANSWER**: Deny the allegations of Paragraph 52.

53. Fiserv's failure to deploy promised safeguards has resulted in MWFFCU paying for services that were not properly performed. Meanwhile, Fiserv has materially increased the risk of hacking and unauthorized access to MWFFCU's extraordinarily sensitive confidential information.

**ANSWER**: Deny the allegations of Paragraph 53.

54. MWFFCU has experienced many security and technological deficiencies in Fiserv's products during the course of the Master Agreement. In light of these material problems, MWFFCU conducted a review of the security controls Fiserv provides to MWFFCU.

**ANSWER**: Deny the allegations contained in the first sentence of Paragraph 54; state that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of

the allegations in the second sentence of Paragraph 54 and, therefore, deny the allegations.

55. MWFFCU's review identified that Fiserv failed to implement a compliant MFA on MWFFCU's online banking website and mobile application used by members to conduct online banking activities.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the scope and parameters of Midwest's alleged review or what Midwest's review identified and, therefore, deny the allegations of Paragraph 55.

56. The Client360 system, which is used by credit union and Fiserv employees for service tickets, change orders, and communications that can include confidential information and requests affecting system security, did not have proper MFA implemented. This system has an email-delivered passcode.

**ANSWER**: Admit that Client360 is used by Midwest and Fiserv employees to communicate about service tickets and technical matters relating to Fiserv's products and services and that Client360's log-in process utilizes multi-factor authentication through delivery of one-time passcodes via email or SMS text message; except as so stated, deny the allegations of Paragraph 56.

57. The security review also identified that other systems used by credit union employees to host confidential information were not protected by proper MFA because Fiserv failed to require the use of MFA in a consistent manner, including:

a. Portico, Fiserv's account processing system that supports real-time transaction processing and integrates with other Fiserv systems for deposits, loans, and member services, which is accessed through a desktop application. Access to Portico only requires a username, password, and, periodically, an email OTP. Access to Portico

allows a user to view personally identifiable information about MWFFCU members, including account numbers, names, physical and email addresses, social security numbers, dates of birth, identification data, transaction histories, and other MWFFCU confidential information.

b. Nautilus Essentials, Fiserv's enterprise content management system used to store, retrieve, and manage documents electronically. Nautilus is accessed through a web browser. Access to Nautilus only requires a username and password. Access to Nautilus allows a user to view confidential documents and may include personally identifiable information, account details, and other sensitive data related to MWFFCU operations.

c. Wisdom Accounting Suite, Fiserv's accounting platform that includes financial information, including general ledgers, accounts payable, fixed assets, and investment tracking, is accessed through a desktop application. Access to Wisdom only requires a username, password, and, periodically, an email OTP. Access to Wisdom Accounting Suite allows a user to view confidential financial records, transaction details and accounting data related to MWFFCU operations.

d. PartnerCare, Fiserv's support platform used by credit unions to research and manage consumer bill payment activity and related service issues, including reviewing member account details and payment history, is accessed via a web browser. Access to PartnerCare only requires a username, password, and, periodically, an email OTP. Access to PartnerCare allows a user access to personally-identifiable information, transaction history, and other confidential data.

e. Portico Reporting Analytics, Fiserv's reporting and analytics tool for institutions

using Portico, provides dashboards and reports for operational and financial analysis. Portico Reporting Analytics is accessed via a web browser. Access to Portico Reporting Analytics only requires a username, password, and, periodically, an email OTP. Access to Portico Reporting Analytics allows a user access to the same information that is contained in Portico, which includes personally-identifiable information about MWFFCU members, including account numbers, names, physical and email addresses, social security numbers, dates of birth, identification data, transaction histories, and other MWFFCU confidential information.

f. xChange is Fiserv's portal used by authorized credit union personnel to access internal resources, training, and administrative information. Access to xChange only requires a username and password. Access to xChange allows a user to view sensitive personal information concerning MWFFCU employees, including employee names, email addresses, and training logs.

g. WC3, which provides access to certain card and cardholder information, requires only username, password, and email-based one-time passcode for logging in.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to what Midwest's "security review" identified and, therefore, deny the allegations of Paragraph 57; state as follows with respect to subparagraphs (a) – (g):

a. Admit that Portico is an account processing system used by Midwest and that it is accessible through an application installed on a credit union desktop; state that the log-in process for Portico utilizes either (1) multi-factor authentication through delivery of a time-based one-time passcode via an authenticator application, or (2)

multi-factor authentication through delivery of a one-time passcode via email, depending on the election of a credit union's employees; state also that Midwest Portico users, subject to access restrictions implemented by the credit union, may view personally identifiable information and transaction history concerning Midwest members; except as so stated, deny the allegations of Paragraph 57(a).

b. Admit that Nautilus Essentials is an electronic system used to store, retrieve, and manage documents and that it is accessible through a web browser; state that Midwest employee users, subject to access restrictions implemented by the credit union, may view documents through Nautilus Essentials that contain personally identifiable information and account details; deny that access to Nautilus Essentials requires only a username and password; except as so stated, deny the allegations of Paragraph 57(b).

c. Admit that Wisdom Accounting Suite is a platform used for financial accounting documents and that it is accessible through an application installed on a credit union desktop; state that the log-in process for Wisdom Accounting Suite utilizes multi-factor authentication through delivery of a one-time passcode via email; state that credit union member data is not stored in Wisdom Accounting Suite; except as so stated, deny the allegations of Paragraph 57(c).

d. Admit that PartnerCare is a product that allows credit union employees to assist members with bill payment activities and that it may be accessed via a web browser; state that the log-in process for PartnerCare utilizes multi-factor authentication through delivery of a one-time passcode via email; state also that Midwest employee users, subject to access restrictions implemented by the credit union, may

view personally identifiable information about Midwest members and transaction histories; except as so stated, deny the allegations of Paragraph 57(d).

e. Admit that Portico Reporting Analytics is a reporting and analytics tool and that it may be accessed through a web browser; state that the log-in process for Portico Reporting Analytics utilizes either (1) multi-factor authentication through delivery of a time-based one-time passcode via an authenticator application or (2) multi-factor authentication through delivery of a one-time passcode via email, depending on the election of a credit union's employees; state also that Midwest employee users, subject to access restrictions implemented by the credit union, may view personally identifiable information about Midwest members and transaction histories; except as so stated, deny the allegations of Paragraph 57(e).

f. Admit that xChange is a portal for authorized credit union personnel to access internal resources, training, and administrative information and that the log-in process for xChange requires a username and password; admit that the xChange portal contains users' names, email addresses, and training information; deny that xChange allows a user to view sensitive personal information concerning Midwest employees; except as so stated, deny the allegations of Paragraph 57(f).

g. Admit that Midwest employee users, subject to access restrictions implemented by the credit union, may view certain card and cardholder information of Midwest members; state that the log-in process for WC3 utilizes username, password, and multi-factor authentication through delivery of a one-time passcode; except as so stated, deny the allegations of Paragraph 57(g).

58. Given the ongoing security risks, and Fiserv's refusal to deal with them in a timely

manner, MWFFCU sent Fiserv a Notice of Breach on or about September 19, 2025. A copy of the Notice of Breach is annexed hereto as Exhibit 9.

**ANSWER**: Admit that Exhibit 9 to the First Amended Complaint is a true and correct copy of the notice of breach Midwest sent to Defendants on or around September 19, 2025; state that the contents of Exhibit 9 speak for themselves; except as so stated, deny the allegations of Paragraph 58, including the contents of Exhibit 9.

59. In addition to notifying Fiserv of its breaches of the Master Agreement and demanding that Fiserv remedy those breaches, MWFFCU also exercised its right under the Master Agreement to request information concerning Fiserv's performance (or lack thereof). Specifically, MWFFCU's requests included:

a. Copies of audits, summaries of test results, and other equivalent evaluations of Fiserv's security, as required by § 4(a) of the Master Agreement and 12 C.F.R. Part 748, Appendix A;

b. A summary of Fiserv's written information security plan for the services provided to MWFFCU within 30 days, as required by § 4(b) of the Master Agreement;

c. Documentation supporting the amounts invoiced by Fiserv for the 12-month period prior to the date of the Notice of Breach, as required § 10(b) of the Master Agreement;

d. Copies of Fiserv's most recent security certifications for the service centers providing services to MWFFCU, as required by § 3(d) of the ASP Services Exhibit to the Master Agreement;

e. Copies of the independent audit reports of the Fiserv service centers providing service to MWFFCU, as required by § 3(f) of the ASP Services Exhibit to the

Master Agreement; and ASP Services Exhibit to the Master Agreement.

f. Results of Fiserv's tests of its Disaster Recovery Plan, as required by § 5(c) of the ASP Services Exhibit to the Master Agreement.

**ANSWER**: State that to the extent Paragraph 59 purports to describe, quote, or characterize Exhibit 9, that document speaks for itself and should be considered as a whole; deny that Fiserv breached any agreement to Midwest or that Midwest properly exercised any alleged "right" for information under the Master Agreement; except as so stated, deny the allegations of Paragraph 59.

60. By letter dated November 10, 2025, Fiserv responded to MWFFCU's request for various audit documentation by referring MWFFCU to a previous August 28, 2025, Information Security Plan, while refusing to provide invoice audit documentation required under Section 10(b) "unless and until MWFFCU identifies the specific products and services for which it believes it was improperly invoiced and charged[,]" arguing that a "blanket" request would not be reasonable. MWFFCU's request for invoice audit documentation related to all of the Fiserv products and/or services used by MWFFCU was reasonable, and Fiserv was contractually obligated to fulfill MWFFCU's request under the Master Agreement. A copy of Fiserv's response is annexed hereto as Exhibit 10.

**ANSWER**: Admit that Defendants responded to Midwest by letter dated November 10, 2025, a true and correct copy of which is attached as Exhibit 10 to the First Amended Complaint, and referred Midwest to the summary of Defendants' information security plan previously provided on August 28, 2025; except as so stated, deny the allegations of Paragraph 60.

61. To date, Fiserv has not provided other documents in response to MWFFCU's audit request.

**ANSWER**: Deny the allegations of Paragraph 61.

62. Fiserv has long known that the authentication controls on the systems it sells to financial institutions suffer from serious security defects. Yet Fiserv has continued to sell, deliver, and operate those platforms while assuring financial-institution clients that their systems and data remain secure. Fiserv's knowing and willful misconduct—a combination of knowledge of security problems, false assurances its systems had certain security controls, and concealing the absence of security controls—amounts to fraud.

**ANSWER**: Deny the allegations of Paragraph 62.

63. Federal regulations call for credit unions such as MWFFCU to "[e]xercise appropriate due diligence in selecting its service providers," to "monitor [their] service providers to confirm they have satisfied their obligations" to protect confidential information, and to "review audits, summaries of test results, or other equivalent evaluations of its service providers." 12 C.F.R. Part 748, App'x A at III.D. To discharge this duty, Fiserv distributes a "Compliance Package" and other related security disclosures to MWFFCU and other financial institution customers.

**ANSWER**: Admit that Fiserv provides its customers with certain compliance reports and materials; state that to the extent Paragraph 63 purports to describe, quote, or characterize 12 C.F.R. Part 748, App'x A, those materials speak for themselves and should be considered as a whole; except as so stated, deny the allegations of Paragraph 63.

64. Fiserv gave such assurances to its clients through the dissemination of documents such as its *Enterprise Risk Management, Security and Privacy Program Overview* (the "*Security Overview*"). A true copy of the *Security Overview* updated in or about April 2018 is annexed hereto as Exhibit 11.

**ANSWER**: Admit that Fiserv made available to its clients a document entitled Enterprise Risk Management, Security and Privacy Program Overview ("Security Overview"); except as so stated, deny the allegations of Paragraph 64.

65. The *Security Overview* contains representations of present fact concerning Fiserv's then-existing "enterprise approach to information and physical security, risk management, incident response, business continuity management, and the privacy and protection of confidential data." Exhibit 11, at 3.

**ANSWER**: State that to the extent Paragraph 65 purports to describe, quote, or characterize the Security Overview, that document speaks for itself and should be considered as a whole; except as so stated, deny the allegations of Paragraph 65.

66. The Security Overview represents, among other things, that Fiserv has "enterprise standards and policies … designed to meet the objectives of applicable security and privacy laws, regulations, industry standards and contractual requirements. All Fiserv business units are required to comply with the Program." *Id*.

**ANSWER**: State that to the extent Paragraph 66 purports to describe, quote, or characterize the Security Overview, that document speaks for itself and should be considered as a whole; except as so stated, deny the allegations of Paragraph 66.

67. The *Security Overview* further represents that Fiserv aligned its cybersecurity program with the NIST Cybersecurity Framework, and that Fiserv performed ongoing analysis of its cybersecurity standards and practices to maintain alignment with the NIST Cybersecurity Framework, including associated updates applicable to critical-infrastructure service providers in the financial services sector:

**<u>NIST Cybersecurity Framework</u>**

> The National Institute of Standards and Technology (NIST) issues and maintains the "Framework for Improving Critical Infrastructure Cybersecurity." This framework provides guidance regarding cybersecurity program elements and their associated effectiveness. Fiserv is a service provider to the Financial Services Sector, which is considered by the Department of Homeland Security to be a critical infrastructure sector. **Fiserv performs ongoing rigorous analysis of its existing cybersecurity standards and practices to maintain alignment with the NIST framework, including all associated updates.**

**ANSWER**: State that to the extent Paragraph 67 purports to describe, quote, or characterize the Security Overview, that document speaks for itself and should be considered as a whole; except as so stated, deny the allegations of Paragraph 67.

68. Fiserv continued to state that the "Fiserv cybersecurity program and framework are built on the NIST framework" in the 2019 updated *Security Overview*, at 7. The 2019 *Security Overview* went on to highlight its obligation to maintain currency with evolving legal and regulatory standards and the role of its Legal Department in coordinating that task:

> Our products and services must meet ever-evolving legal, regulatory and other third-party standards for security, functionality, interoperability and performance. As a result, Fiserv must be aware of and responsive to changes in the external environment to serve our clients properly . . . and to meet regulatory standards. The Fiserv Legal Department continually monitors the legal landscape with respect to the delivery of Fiserv services to its clients, as well as regulatory impact on Fiserv policies, standards and practices. . . . Fiserv monitors and adapts systems and processes in response to a continuously evolving regulatory environment.

*Id*. at 8. A true copy of the 2019 *Security Review* is annexed hereto as Exhibit 12.

**ANSWER**: State that to the extent Paragraph 68 purports to describe, quote, or characterize the Security Overview, that document speaks for itself and should be considered as a whole; except as so stated, deny the allegations of Paragraph 68.

69. Each of these representations is consistent with the regulatory framework by which MWFFCU is required to protect its members' information. Each are also consistent with Fiserv's warranty that its services would be sufficient to enable MWFFCU to comply with the regulatory

requirements. MWFFCU relied upon these representations in determining whether they complied with industry and regulatory standards, and in deciding to whether to continue its relationship with Fiserv and continue to entrust Fiserv with MWFFCU's confidential information.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 69 as to Midwest's regulatory obligations and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 69.

70. Fiserv received repeated warnings that its controls failed to protect financial institutions. Instead of fixing root causes, Fiserv relied on outdated practices and patchwork responses. Those choices exposed MWFFCU's member information to compromise by hackers and forced MWFFCU —and other institutions—to operate under hidden, avoidable risk.

**ANSWER**: Deny the allegations of Paragraph 70.

71. In August 2018, *Krebs on Security* reported a Fiserv defect that allowed unauthorized access to consumers' account and transaction records and allowed changes to phone numbers and email addresses used for transaction alerts.

**ANSWER**: State that to the extent Paragraph 71 purports to describe, quote, or characterize contents of the referenced article, that document speaks for itself; except as so stated, deny the allegations of Paragraph 71.

72. Customers attempted to alert Fiserv. Yet Fiserv did not treat the defect as urgent. Fiserv acted only after media scrutiny made inaction reputationally costly.

**ANSWER**: Deny the allegations of Paragraph 72.

73. Despite customer efforts to notify Fiserv directly (including messages sent to the social media accounts of Fiserv's CEO and various other individuals who were identified as affiliated with Fiserv), Fiserv ignored these warnings until media scrutiny compelled it to

implement a fix.

**ANSWER**: Deny the allegations of Paragraph 73.

74. Fiserv spokesperson Ann Cave admitted publicly that Fiserv delayed addressing these known problems until media exposure forced its hand, confirming its reckless disregard for customer security. Ms. Cave confirmed that Fiserv did not make efforts to remediate this known threat until ***after*** receiving an inquiry from a ***reporter***—when negative press coverage was imminent. According to Ms. Cave, "[a]fter receiving [the reporter's] email, [Fiserv] promptly engaged appropriate resources and worked around the clock to research and remediate the situation. [Fiserv] developed a security patch within 24 hours of receiving notification and deployed the patch to clients that utilize a hosted version of the solution. [Fiserv] will be deploying the patch this evening to clients that utilize an in-house version of the solution." Thus, only after Fiserv faced the imminent prospect of negative press attention did Fiserv "promptly engage[] appropriate resources" to fix its security lapse. This delay, however, left hundreds of financial institutions vulnerable long after Fiserv knew of the risk.

**ANSWER**: State that the contents of Ms. Cave's public statement speak for themselves and should be considered as a whole; except as so stated, deny the allegations of Paragraph 74.

75. Fiserv's lackadaisical approach to cybersecurity persists to this day.

**ANSWER**: Deny the allegations of Paragraph 75.

76. Beginning in early May of 2026, reports started appearing that a ransomware group known as Everest had claimed that it had breached Fiserv's systems. Fiserv did not respond to the reporting of this data breach either publicly or, upon information and belief, to its federally-regulated clients, such as MWFFCU.

**ANSWER**: Admit that in or around May of 2026, there were reports that a ransomware

group known as Everest claimed that it breached Fiserv's systems; state that the contents of those reports speak for themselves; except as so stated, deny the allegations of Paragraph 76.

77. Consistent with its obligations under federal regulations to monitor the performance of its service providers, MWFFCU requested that Fiserv provide information concerning the alleged data breach and whether the data of MWFFCU's confidential information was accessed, in the Everest breach or otherwise.

**ANSWER**: Admit that Midwest requested information concerning the alleged breach by Everest; state that the contents of that communication speak for themselves; except as so stated, deny the allegations of Paragraph 77.

78. Fiserv's counsel responded to MWFFCU's inquiry, providing responses based upon multiple layers of hearsay statements, identifying a third-party vendor of Fiserv as the party that was breached by Everest repeatedly over a five-month period (during which neither Fiserv nor the third-party vendor reported the breach of a system holding federally-protected confidential information). Fiserv's counsel further denied, without any objective proof, that MWFFCU's confidential information had been compromised in any way. Fiserv refused to provide any further information in response to MWFFCU's follow-up inquiries.

**ANSWER**: Admit that Fiserv's counsel responded to Midwest's inquiry about Everest and informed Midwest that Midwest's information had not been compromised; state that the contents of that communication speak for themselves; except as so stated, deny the allegations of Paragraph 78.

79. While MWFFCU was seeking answers to its questions concerning the Everest data breach referred to above, news outlets began publicly reporting the existence of a second data breach involving Fiserv by the group known as "Cl0p". Those sources (which included Reuters)

reported that Cl0p had exploited vulnerabilities in Fiserv's PTC Windchill and FlexPLM software, had stolen Fiserv's data and had been making ransom demands since mid-July 2026, before MWFFCU had made its inquiry about the Everest breach and before Fiserv's counsel's response.

**ANSWER**: Admit that there were reports that a group known as Cl0p claimed that it obtained Fiserv's data; state that the contents of those reports speak for themselves; except as so stated, deny the allegations of Paragraph 79.

80. When MWFFCU requested information concerning Cl0p's intrusion and its effect of MWFFCU's confidential information, it received a similar conclusory denial from Fiserv's counsel: The systems at Fiserv that were breached had nothing to do with the services provided to MWFFCU and its confidential information was not impacted.

**ANSWER**: Admit that Fiserv's counsel responded to Midwest's inquiry about Cl0p and informed Midwest that Midwest's confidential information had not been impacted; state that the contents of that communication speak for themselves; except as so stated, deny the allegations of Paragraph 80.

81. As Fiserv's systems endure repeated attacks, questions have arisen concerning Fiserv's business strategy going forward, including whether it will continue providing services to financial institutions such as MWFFCU under agreements such as the Master Agreement. Fiserv has refused to provide MWFFCU with assurances that Fiserv will continue to provide services under the Master Agreement or that any contemplated transaction will not impair performance of those services.

**ANSWER**: Deny the allegations of Paragraph 81.

82. Unfortunately, Fiserv's corporate culture discouraged emphasis on data security. For example, one of Fiserv's own employees recognized the inadequacy of Fiserv's support and

outreach channels. In a post responding to another *Krebs on Security* article about additional security problems with Fiserv's online banking platform, Adam Kinder, Fiserv's Information Security Manager, publicly invited customers to message him through his personal social media account so that he "can use what influence [and] means I have at our company, above and beyond customer support and outreach branches, to address their concerns." Kinder's public admission tracks what Fiserv's customers experienced: Fiserv's formal channels did not reliably surface or remediate high-risk security defects.

**ANSWER**: State that the contents of Mr. Kinder's public statement speak for themselves, should be considered as a whole, and would provide only as expressly stated; except as so stated, deny the allegations of Paragraph 82, specifically denying that Defendants' "corporate culture discouraged emphasis on data security."

83. In another example, an executive of one of Fiserv's credit union clients found her own account at the credit union had been compromised by a hacker, who gained access to the account, changed the email address and phone number associated with the account, and was thus able to obtain among other things, the executive's home address and transaction history.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Midwest's allegations with respect to the "executive of one of Fiserv's credit union clients," and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 83.

84. The credit union identified the problem in Fiserv's Virtual Branch application as the lack of MFA consistent with accepted security practices and reported the problem to Fiserv.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Midwest's allegations and, therefore, deny the allegations.

85. But Fiserv failed to require MFA, leaving its system vulnerable to further attacks.

**ANSWER**: Deny the allegations of Paragraph 85.

86. Fiserv went so far as to protest to the credit union's counsel that the credit union's complaints relating to Fiserv's failure to implement MFA "imposed significant cost and inconvenience on Fiserv."

**ANSWER**: Deny the allegations of Paragraph 86.

87. For Fiserv, serious efforts at compliance often begin at the proverbial courthouse steps. When regulated financial institutions demand that Fiserv honor its security and oversight obligations, Fiserv resists until litigation forces the issue and compels action. Public filings reflect that pattern.

**ANSWER**: Deny the allegations of Paragraph 87.

88. In 2022, the U.S. Courthouse SDNY Federal Credit Union, the credit union serving judges and employees of the U.S. District Court for the Southern District of New York (the "Court Credit Union"), discovered security problems with Fiserv's online-banking applications. In particular, the Court Credit Union found that Fiserv's authentication controls were weak and could easily be bypassed, allowing Court Credit Union online banking accounts to be hacked.

**ANSWER**: Admit that in or around 2022, the U.S. Courthouse SDNY Federal Credit Union filed a lawsuit against Defendants and was represented by the same counsel representing Midwest in this action; except as so stated, deny the allegations of Paragraph 88.

89. This potential for hacking raised significant additional concerns for the Court Credit Union and its members—Federal judges, U.S. Marshals and court employees. A hacker of the Court Credit Union would be able access nonpublic personal information and transaction history, such as a member's home address and usage patterns for a debit card. Such information could

facilitate stalking, harassment or other criminal conduct directed at those members.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Midwest's allegations with respect to the alleged concerns of U.S. Courthouse SDNY Federal Credit Union and its members, and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 89.

90. The Court Credit Union decided to terminate its relationship with Fiserv largely on account of these security failures. Fiserv demanded an early-termination fee before it would permit Court Credit Union to terminate its relationship.

**ANSWER**: Admit that the Master Agreement between Fiserv and the U.S. Courthouse SDNY Federal Credit Union required the U.S. Courthouse SDNY Federal Credit Union to pay certain fees if it terminated the Master Agreement early; except as so stated, deny the allegations of Paragraph 90.

91. The Court Credit Union sued Fiserv over the online-banking security failures that Fiserv refused to address and to challenge Fiserv's asserted early-termination fee when the Court Credit Union decided to exit Fiserv for a more secure system while undergoing a merger with another credit union. U*.S. Courthouse SDNY Federal Credit Union et al. v. Fiserv Solutions, LLC et al.*, Case No. 1:22-cv-09329 (S.D.N.Y. 2022).

**ANSWER**: Admit that in or around 2022, the U.S. Courthouse SDNY Federal Credit Union filed a lawsuit against Defendants and was represented by the same counsel representing Midwest in this action; except as so stated, deny the allegations of Paragraph 91.

92. Fiserv resolved the case shortly after it was filed. But Fiserv's prioritization of early termination fees and maintaining leverage over the Court Credit Union instead of fixing security problems prolonged the exposure of the Credit Union's members—judicial personnel and U.S.

Marshals—to the risk of hacking.

**ANSWER**: Admit that Fiserv and the U.S. Courthouse SDNY Federal Credit Union, which was represented by the same counsel representing Midwest in this action, resolved their dispute; except as so stated, deny the allegations of Paragraph 92.

93. Other litigation raising security concerns includes: *Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:19-cv-00624-RJC (W.D. Pa. 2019); *Cencap Federal Credit Union v. Fiserv Solutions, LLC*, Case No. 3:25-cv-00913-VDO (D. Conn. 2025); *Self-Help Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 1:25-cv-01112-TDS-LPA (M.D. N.C. 2025); *FiCare Federal Credit Union v. Fiserv Solutions, Inc. et al.*, Case No. 8:26-cv-00231-JLB-TGW (M.D. Fla. 2026); *POLAM Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 2:26-cv-02352-JFW-DFM (C.D. Cal. 2026); and *Educational & Governmental Employees Federal Credit Union v. Fiserv Solutions, LLC et al.*, Case No. 7:26-cv-02402-NSR (S.D.N.Y. 2026).

**ANSWER**: Admit that Bessemer System Federal Credit Union, Cencap Federal Credit Union, Self-Help Federal Credit Union, FiCare Federal Credit Union, POLAM Federal Credit Union, and Educational & Governmental Employees Federal Credit Union filed lawsuits against Defendants and were or are represented by the same counsel representing Midwest in this action; except as so stated, deny the allegations of Paragraph 93.

94. In 2019, the Bessemer System Federal Credit Union sued Fiserv in the Western District of Pennsylvania for failing to safeguard its information properly. Given Fiserv's security problems and apparent inability to fix them, Fiserv agreed to return the credit union's records. After Fiserv failed to dispossess itself of the records, the credit union filed a motion for injunctive relief compelling Fiserv to return the records.

**ANSWER**: Admit that Bessemer System Federal Credit Union filed a lawsuit against Defendants and that Bessemer System Federal Credit Union filed a motion for injunctive relief; except as so stated, deny the allegations of Paragraph 94.

95. In response, Fiserv unequivocally represented to the Bessemer Court it had fully returned the credit union's records, which was central to the court's denial of injunctive relief. Fiserv falsely represented to the Court that it had provided the credit union with "a complete set of" the requested records. *See* Letter dated June 26, 2019, at 2 (a true copy of which is annexed hereto as Exhibit 13). Specifically, Fiserv's opposition to a preliminary injunction filed with the court claimed that "[d]efendants indisputably sent the records" and "[a]ny claim that [d]efendants are 'denying access' to this data is simply false." *Id*.

**ANSWER**: State that to the extent Paragraph 95 purports to describe, quote, or characterize the contents of Exhibit 13 and the referenced opposition brief, those documents speak for themselves; except as so stated, deny the allegations of Paragraph 95.

96. The Bessemer court denied an injunction, based on Fiserv's assurances that the credit union's records had been returned. *See Bessemer System Federal Credit Union v. Fiserv Solutions, LLC et al.*, No. 2:19-cv-00624-RJC (W.D. Pa. 2019), Dkt. 26.

**ANSWER**: Admit that Bessemer System Federal Credit Union filed a motion for injunctive relief and that motion was denied; except as so stated, deny the allegations of Paragraph 96.

97. Later, Fiserv provided the credit union with hundreds of records that Fiserv previously assured the Bessemer court it had already returned—confirming that Fiserv misled the credit union's counsel and the court.

**ANSWER**: Admit that Fiserv provided Bessemer System Federal Credit Union with

records of the credit union; except as so stated, deny the allegations of Paragraph 97.

98. Instead of candidly disclosing known defects to its clients and coordinating remediation, Fiserv actively concealed defects from becoming known to its clients. When Bessemer System Federal Credit Union reported security problems that allowed online banking accounts to be readily taken over by hackers, Fiserv demanded that the credit union "[r]efrain from dissemination or disclosure of any information or records relating to the 'security review' to third parties, including any clients . . . of Fiserv." Those threats and misconduct did not protect Fiserv's customers; it protected Fiserv's reputation and revenue.

**ANSWER**: State that the contents of the referenced communication concerning Bessemer's attempted brute force attack on Fiserv's systems speak for themselves, should be considered as a whole, and would provide only as expressly stated; except as so stated, deny the allegations of Paragraph 98.

99. Fiserv puts revenue first. On January 8, 2026, it sent its credit union customers an "Enhanced Authentication Product Sunset Notice." The notice stated that Fiserv would discontinue the existing "Enhanced Authentication" feature for Virtual Branch Next, effective May 31, 2026. A copy of the notice is annexed hereto as Exhibit 14.

**ANSWER**: Admit that Fiserv issued a communication concerning the discontinuation of the Enhanced Authentication feature for Virtual Branch Next; state to the extent Paragraph 99 purports to describe, quote, or characterize contents of that communication, that communication speaks for itself; except as so stated, deny the allegations of Paragraph 99.

100. "Enhanced Authentication" is a lie. Fiserv has failed to provide even baseline authentication for MWFFCU, much less any "advanced" authentication.

**ANSWER**: Deny the allegations of Paragraph 100.

101. Fiserv paired the withdrawal of Enhanced Authentication with a sales deadline. Fiserv's notice said that credit unions must sign a new agreement by March 2, 2026, to receive a replacement service Fiserv marketed as "SecureNow," which it touted as "additional security" for Virtual Branch Next.

**ANSWER**: State that to the extent Paragraph 101 purports to describe, quote, or characterize contents of the referenced notice, that notice speaks for itself; except as so stated, deny the allegations of Paragraph 101.

102. SecureNow is not an "upgrade." It is a mid-contract shake-down. Fiserv already owes MWFFCU and its other customers a contractual duty to safeguard their confidential information. Fiserv cannot pull back security features mid-contract and then sell them back under new terms and higher pricing.

**ANSWER**: Deny the allegations of Paragraph 102.

103. SecureNow does not solve the problem it claims to address. SecureNow does not provide possession-based MFA and therefore fails to address the root cause of online banking account takeovers. Even a credit union that pays for SecureNow remains exposed to hackers and cannot meet evolving regulatory expectations for protecting member information.

**ANSWER**: Deny the allegations of Paragraph 103.

104. In a February 12, 2026, webinar for its clients, Fiserv's representatives disclosed that SecureNow's authentication process was weaker than advertised. Those representatives confirmed that rather than requiring the use of a one-time password for every login attempt, SecureNow would only require the use of OTPs for every log in initially. Once the system "learned the behavior" of the users, it would only require an OTP if there was something out of the ordinary, such as a login from a new device or a new location.

**ANSWER**: Deny the allegations of Paragraph 104.

105. Fiserv continues to pressure its credit union customers to sign up for SecureNow, sending follow-up notices concerning the requirement to enroll in SecureNow as recently as March 6, 2026. A copy of the March 6, 2026, follow-up notice is attached as Exhibit 15.

**ANSWER**: Admit that Fiserv personnel sent Midwest a communication containing certain documentation and a Docusign link on or around March 6, 2026; state that to the extent Paragraph 105 purports to describe, quote, or characterize contents of that communication and documents linked thereto, that communication and linked documents speak for themselves; except as so stated, deny the allegations of Paragraph 105.

106. Fiserv's intent is to compel enrollment in SecureNow. In the February 12, 2026, webinar, Fiserv's representatives stated that implementation of SecureNow was mandatory. One of Fiserv's executives confirmed during the webinar that access to online banking would be "paused" after the May 31, 2026, deadline imposed by Fiserv until the credit union put SecureNow in place.

**ANSWER**: Admit that Fiserv intends to discontinue Enhanced Authentication and replace it with SecureNow; except as so stated, deny the allegations of Paragraph 106, specifically denying that Midwest's access to online banking was "paused."

107. As a regulated financial institution, MWFFCU must conduct oversight of third-party vendors such as Fiserv. To facilitate and influence that oversight, Defendants authored, assembled, and provided to its financial-institution customers a "Compliance Package" that represents Fiserv has implemented security measures to meet financial-institution regulatory requirements, on which MWFFCU relied in conducting its required oversight of Defendants as a third-party vendor.

**ANSWER**: Admit that Fiserv provides its customers with certain compliance reports and materials; state that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 107 as to Midwest's regulatory obligations and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 107.

108. Defendants updated the Compliance Package from time to time throughout the parties' ongoing relationship and, through each updated version, affirmatively represented to MWFFCU that Defendants continued to comply with evolving regulatory and industry requirements. MWFFCU relied on those recurring representations in continuing to use Defendants' services and in foregoing other vendor options. Those representations were false and misleading.

**ANSWER**: Admit that Fiserv updates its compliance reports and materials from time to time; except as so stated, deny the allegations of Paragraph 108, specifically denying that Fiserv made misleading statements.

109. Among the materials in Defendants' Compliance Package is the *Standard Information Gathering Questionnaire*, which Defendants provided to MWFFCU. MWFFCU used the *Standard Information Gathering Questionnaire* provided by Defendants to assess Defendants' security posture and vendor risk, as Defendants knew and intended.

**ANSWER**: Admit that Fiserv makes available to its clients a document entitled Standard Information Gathering Questionnaire; state that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 109 as to Midwest's use or receipt of the Standard Information Gathering Questionnaire and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 109.

110. The questionnaire asks: "Are policies and standards based on accepted control

standards, frameworks, and industry practices?"

**ANSWER**: State that to the extent Paragraph 110 purports to describe, quote, or characterize the referenced Standard Information Gathering Questionnaire, that document speaks for itself; except as so stated, deny the allegations of Paragraph 110.

111. Fiserv answered "Yes," and further represented that Fiserv's cybersecurity policies and standards track NIST and other recognized standards. Specifically, Fiserv represented, among other things:

> Fiserv has established a Global Cybersecurity and Technology Management Policy based on NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard. The Global Cybersecurity and Technology Management Policy and standards have been designed to meet applicable industry and regulatory requirements.
>
> - Interagency Guidelines Establishing Information Security Standards and on Response Programs for Unauthorized Access to Customer Information and Customer Notice
> - EU General Data Protection Regulation (GDPR)
> - Applicable European Banking Authority (EBA) guidelines
> - Fair Credit Reporting Act (FCRA)
> - Gramm-Leach-Bliley Act (GLBA)
> - Health Insurance Portability and Accountability Act (HIPAA)
> - Numerous state and /or country specific privacy and security laws including the IT Security Act 2.0 from the German Federal Office for Information Security
> - International Organization for Standardization (ISO) 27001, Information Security Management
> - National Institute of Standards and Technology (NIST) Cyber Security Framework
> - Payment Card Industry Data Security Standard (PCI DSS)

**ANSWER**: State that to the extent Paragraph 111 purports to describe, quote, or characterize the referenced Standard Information Gathering Questionnaire, that document speaks for itself; except as so stated, deny the allegations of Paragraph 111.

112. Those statements were false and misleading. As described above, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements.

**ANSWER**: Deny the allegations of Paragraph 112.

113. Indeed on January 20, 2026, Fiserv, through counsel, asserted in open court in data-security litigation from one of its other financial institution clients that NIST is not mandatory or binding on Fiserv, and that there is nothing in Fiserv's Master Agreement that requires Fiserv to adopt NIST standards. Fiserv's recent admissions revealed that Fiserv's prior representations concerning its alignment with the NIST standards did not reflect Fiserv's actual cybersecurity practices. Moreover, given Fiserv's position that its Master Agreement imposes no contractual obligation for Fiserv to incorporate or maintain alignment with the NIST standards, Fiserv's prior representations concerning its compliance with NIST standards were extra-contractual statements of fact that are actionable as fraud.

**ANSWER**: State that the contents of the statement of Defendants' counsel in other litigation speak for themselves; except as so stated, deny the allegations of Paragraph 113.

114. The questionnaire also asks: "Is Multi-Factor Authentication (MFA) utilized?" Fiserv answered: "Yes."

**ANSWER**: State that to the extent Paragraph 114 purports to describe, quote, or characterize the referenced Standard Information Gathering Questionnaire, that document speaks for itself; except as so stated, deny the allegations of Paragraph 114.

115. That statement was false and misleading. As described above, Fiserv did not utilize MFA on at least one of its systems, and the authentication process used does not meet recognized standards for MFA.

**ANSWER**: Deny the allegations of Paragraph 115.

116. Fiserv also provided MWFFCU with a *Fiserv Cybersecurity Fact Sheet 2025*, which again represented that "Fiserv has established a Global Cybersecurity and Technology Management Policy based on authoritative sources that include regulatory and industry publications such as NIST's CSF (National Institute of Standards and Technology, Cyber Security Framework) which is a subset of controls within the comprehensive NIST SP 800-53 standard." *See* Exhibit 3, at 3.

**ANSWER**: State that to the extent Paragraph 116 purports to describe, quote, or characterize the referenced Cybersecurity Fact Sheet, that document speaks for itself; except as so stated, deny the allegations of Paragraph 116.

117. The Fiserv Cybersecurity Fact Sheet 2025 further represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." *Id*. MWFFCU received the Cybersecurity Fact Sheet 2025 as part of the recurring Compliance Package described above and relied on it, together with Defendants' other recurring representations, in continuing to use Defendants' services rather than seeking a different vendor.

**ANSWER**: Admit that Fiserv made available to Midwest a document entitled Fiserv Cybersecurity Fact Sheet 2025; state that to the extent Paragraph 117 purports to describe, quote, or characterize the referenced Cybersecurity Fact Sheet, that document speaks for itself; except as so stated, deny the allegations of Paragraph 117.

118. Those statements were false and misleading. As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

**ANSWER**: Deny the allegations of Paragraph 118.

119. *Fiserv's Global Data Ethics and Privacy Program Fact Sheet 2025* represents that Fiserv that adopted privacy principles – regardless of location – which use "appropriate security safeguards" and "[r]ecognizes the importance of data privacy and holds [Fiserv] accountable to [its] data protection standards." Those statements were false and misleading. Fiserv has failed to adequately use MFA leaving sensitive accounts exposed and has failed to meet applicable industry and regulatory standards including NIST standards.

**ANSWER**: State that to the extent Paragraph 119 purports to describe, quote, or characterize the referenced Global Data Ethics and Privacy Program Fact Sheet, that document speaks for itself; except as so stated, deny the allegations of Paragraph 119.

120. Fiserv's compliance representations to MWFFCU rest heavily on its SOC 1 Type 2 Report (the "SOC Report"), which Fiserv furnishes to financial institution customers as independent assurance that its security controls are adequate. Federal regulations require credit unions to obtain and review such audits in conducting vendor oversight. *See* 12 C.F.R. Part 748, App'x A § II.D.3. MWFFCU relied on the SOC Report in evaluating Fiserv's security posture and in fulfilling its own regulatory obligations.

**ANSWER**: Admit that Fiserv provides to its financial institution clients with SOC 1 Type 2 Reports; state that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 120 as to Midwest's regulatory obligations and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 120

121. Fiserv's current Chief Risk Officer (CRO), Joanne Sebby served as a liaison to the Federal Financial Institutions Examination Council, which establishes the cybersecurity standards at issue in this litigation. A true and correct copy of the biography of Joanne Sebby on Fiserv's website, located at https://www.fiserv.com/en/about-fiserv/executive-leadership/joanne-sebby.html and accessed on April 17, 2026 is annexed hereto as Exhibit 16; *see* ¶ 37, *supra*. Upon information and belief, Ms. Sebby has personal, first-hand knowledge of the cybersecurity standards promulgated by FFIEC, yet failed to implement them at Fiserv or conduct other appropriate risk assessments to ensure Fiserv was protecting the highly sensitive information its customers entrusted.

**ANSWER**: State that to the extent Paragraph 121 purports to describe, quote, or characterize the contents of the referenced website, that website speaks for itself; except as so stated, deny the allegations of Paragraph 121.

122. As described in the SOC Report, the CRO is a member of Fiserv's Management Committee with "leadership responsibilities for the Enterprise Risk & Controls function." Under Fiserv's "Three Lines of Defense" governance model, the CRO occupies the Second Line of Defense: the executive directly responsible for the design, maintenance, and oversight of risk management practices, including the enterprise-level security controls applicable to all Fiserv products.

**ANSWER**: State that to the extent Paragraph 122 purports to describe, quote, or characterize the contents of the SOC 1 Type 2 Report, that document speaks for itself; except as so stated, deny the allegations of Paragraph 122.

123. The failure of Fiserv's Chief Risk Officer to ensure Fiserv was complaint with FFIEC cybersecurity standards, is consistent with Fiserv's broader pattern of disregard of known

risks and concealment. Rather than making its systems compliant with the cybersecurity standards Fiserv's own Chief Risk Officer would be expected to know were appropriate to address hacking risks, Fiserv decided not to implement those standards.

**ANSWER**: Deny the allegations of Paragraph 123.

124. Fiserv, Inc. publishes a publicly available "Privacy Notice" that states, as present fact, the security measures Fiserv claims it has in place to protect customer data. The Privacy Notice purports to apply to Fiserv, Inc. and all subsidiaries and affiliates, including Fiserv Solutions. The Privacy Notice is maintained on an ongoing basis and MWFFCU relied on the Privacy Notice's representations, together with Defendants' other recurring assurances, in continuing its relationship with Defendants rather than seeking a different vendor.

**ANSWER**: State that to the extent Paragraph 124 purports to describe, quote, or characterize the contents of Fiserv, Inc.'s Privacy Notice, that document speaks for itself; except as so stated, deny the allegations of Paragraph 124.

125. In Section 6, Fiserv represents it has "in place appropriate security measures to prevent . . . personal data from accidentally being lost, used or accessed in an unauthorized way, altered or disclosed."

**ANSWER**: State that to the extent Paragraph 125 purports to describe, quote, or characterize the contents of Fiserv, Inc.'s Privacy Notice, that document speaks for itself; except as so stated, deny the allegations of Paragraph 125.

126. That statement was false and misleading when made. Contrary to Fiserv's representation, Fiserv did not have appropriate security measures in place to prevent MWFFCU's data from being used or accessed in an unauthorized way.

**ANSWER**: Deny the allegations of Paragraph 126.

127. Fiserv's misrepresentations and concealments harmed MWFFCU in a straightforward way: it deprived MWFFCU of material facts that would have altered MWFFCU's decisions about risk, vendor oversight, and continued use of Fiserv services. Fiserv withheld the truth while continuing to accept payment for services it represented as secure and compliant with contractual and legal requirements.

**ANSWER**: Deny the allegations of Paragraph 127.

128. Fiserv had strong financial motives to sustain the appearance of robust cybersecurity to maintain market and customer confidence in its systems. Fiserv's public filings reflect that goodwill and intangible assets comprise a significant portion of Fiserv's corporate assets, and as a publicly traded company, Fiserv's valuation depends on market and customer confidence in its systems. By suppressing adverse security information and downplaying risk, Fiserv misleadingly obtained customer revenue, reduced its customers' switching pressure, and fattened corporate goodwill—at its customers' expense.

**ANSWER**: Deny the allegations of Paragraph 128.

129. Fiserv's incentives to deceive intensified recently as Fiserv's share price fell sharply. Fiserv's stock is down approximately 70% over the past year, heightening Fiserv's pressure to avoid disclosures that could further impair market confidence and customer retention.

**ANSWER**: Admit that Fiserv, Inc.'s share price has declined over the past year; except as so stated, deny the allegations of Paragraph 129.

130. Fiserv's misconduct was far from accidental. Fiserv knew about material security defects, minimized or misrepresented them, delayed remediation until external exposure threatened, and pressed to suppress the truth from its customers.

**ANSWER**: Deny the allegations of Paragraph 130.

131. Fiserv's course of conduct shows willful, wanton, and reckless disregard for the privacy and security of financial-institution customers and their members and supports an award of punitive damages.

**ANSWER**: Deny the allegations of Paragraph 131.

132. As a direct result of Fiserv's misconduct, MWFFCU has incurred and will continue to incur substantial costs to protect members, monitor for fraud, investigate suspicious activity, and mitigate long-tail identity-theft risks created by Fiserv's security failures.

**ANSWER**: Deny the allegations of Paragraph 132.

133. The information entrusted to Fiserv includes highly sensitive personal and financial data. If compromised, identity thieves can weaponize that data to drain accounts, change contact credentials, defeat fraud alerts, and impersonate members across other systems. This is why federally insured credit unions are required to oversee their vendors to ensure that the credit union is meeting federal requirements and safeguarding its members' information.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 133 and, therefore, deny the allegations.

134. The harm does not end with a single incident. Once exposed, member information can circulate indefinitely, including through illicit marketplaces. Members face continuing risk of identity theft, account takeover, and downstream fraud—often months or years after the original exposure.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 134 and, therefore, deny the allegations.

135. Cybercriminals also exploit stolen data to inflict non-monetary harms, including harassment, extortion attempts, and targeted stalking. Transaction times and locations can reveal

personal routines and physical whereabouts.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 135 and, therefore, deny the allegations.

136. Most importantly, members face irreparable harm when hackers gain access to their most sensitive financial information. Transactional data can reveal intimate facts of members' lives, including, for example, which members paid retainers to a divorce attorney, or which members received care from a psychiatrist, drug-rehabilitation clinic, cancer center, fertility clinic, or abortion clinic. *See The Hidden Emotional Toll on Victims of Data Breaches*, THE WALL STREET JOURNAL (Nov. 25, 2025), https://www.wsj.com/tech/cybersecurity/data-breach-victims-0b01a5ab?mod=Searchresults&pos=2&page=1. Exhibit 17 is a true and correct copy of *The Wall Street Journal* article.

**ANSWER**: State that to the extent Paragraph 136 purports to describe, quote, or characterize the referenced article, that document speaks for itself; except as so stated, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 136 and, therefore, deny the allegations.

137. Criminals can also use MWFFCU's member information to fuel embarrassment, blackmail, or harassment in person or online, or to commit other types of fraud, including obtaining ID cards or driver's licenses, fraudulently obtaining tax returns and refunds, and obtaining government benefits. For example, the times and locations members use their debit cards can be used to stalk and victimize those individuals. A report from the United States Government Task Force on Identity Theft explains the harm to MWFFCU:

> Businesses suffer most of the direct losses from ... identity theft because individual victims generally are not held responsible for fraudulent charges. Individual victims, however, also collectively spend billions of dollars recovering from the effects of the crime.

> In addition to the losses that result when identity thieves fraudulently open accounts or misuse existing accounts, monetary costs of identity theft include indirect costs to businesses for fraud prevention and mitigation of the harm once it has occurred (e.g., for mailing notices to consumers and upgrading systems). Similarly, individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit…
>
> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

**ANSWER**: State that to the extent Paragraph 137 purports to describe, quote, or characterize the referenced article, that document speaks for itself; except as so stated, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 137 and, therefore, deny the allegations.

138. To put it into context, the FBI Internet Crime Complaint Center's 2024 Internet Crime Report reveals that, between 2020 and 2024, it received 4.2 million complaints related to various internet scams impacting American citizens around the globe, amounting to a staggering $50.5 billion in reported losses, and an average of 836,000 complaints received per year. In 2024 alone, the crime categories of personal data breach, general data breach, credit card/check fraud, and identity theft accounted for $2.19 billion in losses. The average reported loss per complaint in 2024 was $19,372.

**ANSWER**: State that to the extent Paragraph 138 purports to describe, quote, or characterize the referenced report, that document speaks for itself; except as so stated, Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 138 and, therefore, deny the allegations.

139. Stolen data can also be offered for sale on the "dark web," an unindexed part of the

internet (often heavily encrypted) that makes it difficult for authorities to detect a website's location or owners. The dark web is notorious for hosting marketplaces selling items such as weapons, drugs, and personal information.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 139 and, therefore, deny the allegations.

140. Once a bad actor buys member information, it can then be used to gain access to different areas of the victim's digital life, including financial accounts, social media, and credit card details. During that process, other sensitive data may be harvested from the victim's accounts, as well as from those belonging to family, friends, and colleagues.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 140 and, therefore, deny the allegations.

141. In addition to member information that can be accessed, a hacked online banking account can be very valuable to cyber criminals for other attacks. Since online banking accounts are linked to other accounts (for example, to transfer funds between financial institutions), a hacked online banking account can serve as a gateway for additional criminal activity.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 141 and, therefore, deny the allegations.

142. The problems associated with identity theft are exacerbated by the fact that many identity thieves will delay exploiting stolen information, extending the threat of identity theft long after the initial breach. The stolen data may be listed for sale on the dark web years after the initial breach, enabling unauthorized individuals to purchase and exploit it after the security incident has faded from immediate concern.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief

as to the truth or falsity of the allegations of Paragraph 142 and, therefore, deny the allegations.

143. Compounding this risk is the practice known as "dwell" by hackers, where unauthorized access remains undetected for extended periods, amplifying long-term harm. During this time, cybercriminals can continue exploiting across multiple systems within the same network, gather additional sensitive information, and fortify their control over compromised data without triggering immediate detection. This latency often results in the hack going unnoticed until long after the initial breach, amplifying the potential for further exploitation.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 143 and, therefore, deny the allegations.

144. Because hackers can remain undetected for extended periods and delay the use of stolen information, the full scope of a breach may not be immediately apparent. Indeed, in order to protect its member information, MWFFCU will need to remain vigilant against compromise and unauthorized use of its member information for years and decades to come.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 144 and, therefore, deny the allegations.

145. MWFFCU exercised reasonable diligence but could not discover Fiserv's misconduct earlier due to Fiserv's deliberate and active concealment.

**ANSWER**: Deny the allegations of Paragraph 145; further state that the allegations contained in Footnote 18 assert a legal conclusion as to which no response is required and, therefore, deny the allegations.

146. MWFFCU became aware of the harm caused by Fiserv's security deficiencies only recently, well within the applicable limitations period.

**ANSWER**: Deny the allegations of Paragraph 146.

147. MWFFCU previously did not suspect, and had no reason to suspect, that Fiserv's products and services caused damages and harm.

**ANSWER**: Deny the allegations of Paragraph 147.

148. The highly technical nature of Fiserv's products and services prevented earlier detection of these serious cybersecurity problems.

**ANSWER**: Deny the allegations of Paragraph 148.

149. Fiserv maintained exclusive knowledge of the material defects and vulnerabilities designed and implemented into its products and services, actively misleading MWFFCU.

**ANSWER**: Deny the allegations of Paragraph 149.

150. In addition, Fiserv's fraudulent concealment and/or other tortious conduct has tolled the running of any statute of limitations.

**ANSWER**: Deny the allegations of Paragraph 150.

151. Fiserv was actually aware of the material defects in its systems, and its failure to comply with regulatory and contractual requirements. Fiserv also knowingly, affirmatively, and actively concealed from MWFFCU the risks associated with the defects in its products and services, and that those defects caused damages and harm to MWFFCU.

**ANSWER**: Deny the allegations of Paragraph 151.

152. Fiserv's purpose in concealing these facts was to induce MWFFCU to continue relying on its services and to delay MWFFCU's discovery of its claims. By concealing material information, Fiserv sought to avoid early detection of its misconduct and to prevent MWFFCU from initiating legal action within the applicable limitations period.

**ANSWER**: Deny the allegations of Paragraph 152.

153. Fiserv committed tortious and/or fraudulent acts that continue to this day. As of the

date of this Amended Complaint, Fiserv still has not disclosed, and continues to conceal, that it designed and implemented insecure features into its products and services, and that the representations it made about the security of its services are false. Despite its knowledge of the defects and their attendant risks, Fiserv continues to market its products and services to financial institutions while simultaneously omitting the disclosure of known and foreseeable harms.

**ANSWER**: Deny the allegations of Paragraph 153.

154. MWFFCU was unaware and could not have reasonably known or learned through reasonable diligence that it had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Fiserv's acts and omissions.

**ANSWER**: Deny the allegations of Paragraph 154.

155. Moreover, Fiserv's obligations under the Master Agreement are ongoing and include the continued implementation of appropriate information security measures, adherence to regulatory requirements, and the exercise of good faith and fair dealing in not exposing MWFFCU to vastly greater harm than bargained for and well outside commercially reasonable norms. Each act of non-compliance with these contractual obligations renewed the limitations period under the continuing duty doctrine.

**ANSWER**: State that to the extent Paragraph 155 purports to describe, quote, or characterize the Master Agreement, that document speaks for itself; further state that the allegations of Paragraph 155 assert a legal conclusion as to which no response is required and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 155.

156. For the foregoing reasons, Fiserv is estopped from relying on any statutes of limitation or repose, or other time-based defenses in this action. All applicable statutes of limitation and repose have been tolled by operation of the discovery rule, the continuing duty doctrine, and

by Fiserv's active concealment with respect to all claims against it.

**ANSWER**: Deny the allegations of Paragraph 156.

157. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

**ANSWER**: Defendants incorporate their responses to the allegations of Paragraphs 1 through 156 as though fully set forth herein.

158. The Master Agreement is a valid contract binding Fiserv Solutions.

**ANSWER**: Admit that the Master Agreement is a valid and binding contract enforceable in accordance with its terms.

159. In addition to the express terms of the Master Agreement, the implied covenant of good faith and fair dealing applies to the Master Agreement. To vindicate the parties' apparent intentions and reasonable expectations, Fiserv Solutions was obligated to invoice MWFFCU only for services actually and properly performed and to provide security appropriate for a federally regulated credit union that stores extraordinarily sensitive consumer financial information.

**ANSWER**: State that to the extent Paragraph 159 purports to describe, quote, or characterize the Master Agreement, that document speaks for itself; further state that the allegations of Paragraph 159 assert a legal conclusion as to which no response is required and, therefore, deny the allegations; except as so stated, deny the allegations of Paragraph 159.

160. MWFFCU has duly performed all obligations and satisfied all conditions required of it under the Master Agreement, except for those that were waived or excused by Fiserv Solutions.

**ANSWER**: Deny the allegations of Paragraph 160.

161. Fiserv Solutions has repeatedly and materially breached the Master Agreement,

including by:

a. violating Section 3(b) of the Master Agreement by failing to use the same care and discretion to prevent unauthorized disclosure of MWFFCU's confidential information as Fiserv uses with its own similar information that it does not wish disclosed, but in no event less than a reasonable standard of care and no less than is required by law;

b. violating Section 4(a) of the Master Agreement by failing to implement and maintain an information security program that appropriately protects the security and confidentiality of MWFFCU's information;

c. violating Section 4(a), 4(b), 10(a), and 10(b) of the Master Agreement, and Sections 3(d), 3(f) and 5(c) of the ASP Services Exhibit to the Master Agreement, by failing to provide the documentation required to be produced to MWFFCU;

d. violating Section 6(a)(iii) of the Master Agreement, by failing to comply with all regulatory requirements;

e. violating Section 10(b) of the Master Agreement by refusing to provide MWFFCU with documentation supporting the amounts invoiced by Fiserv;

f. violating Section 3(e) of the ASP Services Exhibit to the Master Agreement, including the warranties of conformity to specifications and due care;

g. violating Section 6 of the Fiserv Privacy Notice, by failing to implement appropriate security measures to prevent unauthorized access, use, and disclosure of personal data;

h. repudiating its obligations, including by discontinuing Enhanced Authentication services mid-contract and insisting that MWFFCU agree to additional and different

contract terms and pay additional charges for "SecureNow" or other ostensible security upgrades that Fiserv is under a preexisting contractual duty to provide; and

i. violating the implied covenant of good faith and fair dealing by issuing invoices for services not properly performed and exposing MWFFCU to hacking and fraud risks vastly greater than it had bargained for and well outside of commercially reasonable norms.

**ANSWER**: Deny the allegations of Paragraph 161, including the allegations of subparagraphs (a) through (i).

162. Fiserv Solutions' contract breaches were, at a minimum, grossly negligent. Fiserv had actual knowledge, through reports from financial institutions and others, that Fiserv's security controls were absent or woefully inadequate and have led to significant fraud losses and hacking at other financial institutions. Fiserv Solutions, however, failed to properly investigate or secure its systems. Nor did Fiserv Solutions alert MWFFCU of the security problems. Fiserv Solutions' contract breaches smack of intentional wrongdoing and evince a reckless indifference to MWFFCU's rights.

**ANSWER**: Deny the allegations of Paragraph 162; state that the allegations contained in footnote 19 assert a legal conclusion to which no response is required and, therefore, deny the allegations.

163. Fiserv Solutions' misconduct was not an isolated incident; it is part of a dangerous pattern that puts life savings and extraordinarily sensitive financial information of scores of consumers into the reach of hackers. By withholding basic safeguards from MWFFCU's systems despite known hacking risks, Fiserv exposed thousands of consumers to hacking, fraud, and identity theft. And MWFFCU is not alone: Fiserv's deficient approach to cybersecurity for its

clients has also endangered countless other financial institutions and their customers. Fiserv's misconduct is actionable as an independent tort as well as egregious, repeated, and directed at MWFFCU as part of a broader course of conduct that endangers the public. Fiserv's misconduct reflects a high degree of moral turpitude and such wanton dishonesty as to imply a criminal indifference to Fiserv's civil obligations. Punitive damages are appropriate to deter Fiserv from endangering others in the same way again.

**ANSWER**: Deny the allegations of Paragraph 163.

164. As a direct and proximate result of Fiserv Solutions' contract breaches, MWFFCU has suffered and will continue to suffer damages and harm.

**ANSWER**: Deny the allegations of Paragraph 164.

165. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

**ANSWER**: Defendants incorporate their responses to the allegations of Paragraphs 1 through 164 as though fully set forth herein.

166. MWFFCU may have the Master Agreement rescinded due to Fiserv's breaches. Fiserv's breaches are so material, willful, substantial, and fundamental that they have defeated the object of the parties in making the Master Agreement. These breaches have left MWFFCU in a position substantially different from what the parties intended at the time they entered into the Master Agreement.

**ANSWER**: Deny the allegations of Paragraph 166.

167. MWFFCU may have the Master Agreement rescinded because Fiserv misrepresented to MWFFCU the existence and nature of Fiserv's security controls. These representations were material to MWFFCU, and it reasonably relied on them in deciding whether

to enter into and continue performing under the Master Agreement, which did not disclaim reliance on these types of specific representations, and the falsity of Fiserv's representations was within Fiserv's peculiar knowledge and could not have been reasonably discovered by MWFFCU.

**ANSWER**: Deny the allegations of Paragraph 167.

168. MWFFCU may have the Master Agreement rescinded due to commercial impracticability and frustration of purpose because unforeseeable events not caused by MWFFCU have altered the essential nature of the Master Agreement, and MWFFCU has been unable to obtain its expected bargain from Fiserv.

**ANSWER**: Deny the allegations of Paragraph 168.

169. MWFFCU has no adequate remedy at law. Accordingly, this Court should rescind the Master Agreement.

**ANSWER**: Deny the allegations of Paragraph 169.

170. MWFFCU repeats and re-alleges the allegations set forth in the foregoing paragraphs as if fully set forth here.

**ANSWER**: Defendants incorporate their responses to the allegations of Paragraphs 1 through 169 as though fully set forth herein.

171. The Master Agreement is a valid contract binding Fiserv Solutions.

**ANSWER**: Admit that the Master Agreement is a valid and binding contract enforceable in accordance with its terms.

172. MWFFCU has performed or substantially performed its obligations under the Master Agreement, except for those, if any, that were waived or excused by Fiserv Solutions.

**ANSWER**: Deny the allegations of Paragraph 172.

173. MWFFCU is ready, willing, and able to perform its remaining obligations until the

contract terminates or is rescinded by an order of this Court.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 173 with respect to Midwest's readiness, willingness, or ability to perform its contractual obligations and, therefore, deny the allegations of Paragraph 173.

174. Fiserv Solutions is presently breaching, and absent relief will continue to breach, its contractual obligations to safeguard MWFFCU's confidential information.

**ANSWER**: Deny the allegations of Paragraph 174.

175. Fiserv Solutions has repudiated the Master Agreement, and absent relief will continue to breach the Master Agreement, by withdrawing security offerings provided under the Master Agreement and compelling MWFFCU to accept new service offerings (such as "SecureNow"), at increased prices, in order for Fiserv to continue performing its preexisting duty to safeguard MWFFCU's confidential information.

**ANSWER**: Deny the allegations of Paragraph 175.

176. Fiserv is capable of performing the Master Agreement, including by deploying phishing-resistant, possession-based MFA and other enhanced security controls that it uses to safeguard its own sensitive data.

**ANSWER**: Admit that Fiserv is capable of performing its obligations under the Master Agreement; except as so stated, deny the allegations of Paragraph 176.

177. The loss of confidentiality and risk of unauthorized access constitute irreparable harms not adequately compensable by money damages alone.

**ANSWER**: State that the allegations of Paragraph 177 assert a legal conclusion as to which no response is required and, therefore, deny the allegations.

178. Accordingly, the Court should issue an order of specific performance compelling Fiserv Solutions to specifically perform its obligations to MWFFCU, including securing MWFFCU's confidential information as required by the Master Agreement.

**ANSWER**: Deny the allegations of Paragraph 178.

179. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

**ANSWER**: Defendants incorporate their responses to the allegations of Paragraphs 1 through 178 as though fully set forth herein.

180. Genuine disputes exist between the parties concerning the Master Agreement and its existence, meaning, enforceability, and applicability. This Court's declarations of the parties' rights would resolve the legal relations of the parties to justiciable controversies.

**ANSWER**: Deny the allegations of Paragraph 180.

181. **No Obligation to Pay for or Contract for "SecureNow" (Preexisting Contractual Duty; Inadequate Security)**. MWFFCU seeks a declaration that it has no obligation to enter into any agreement for Fiserv's "SecureNow" service. Under the Master Agreement, Fiserv bears a preexisting duty to safeguard MWFFCU'S information in accordance with governing contractual and regulatory standards. Fiserv may not condition its performance of that duty on MWFFCU'S agreement to new or different contractual terms or on the payment of additional fees. MWFFCU further seeks a declaration that Fiserv's "SecureNow" product does not satisfy Fiserv's existing contractual and regulatory obligations to appropriately protect MWFFCU'S information.

**ANSWER**: Admit that Midwest seeks a declaration; except as so stated, deny the allegations of Paragraph 181, specifically denying that Midwest is entitled to declaratory relief.

182. **Unenforceability of Master Agreement's Exculpatory and Limitation-of-Liability Provisions (Public Policy)**. MWFFCU is entitled to a declaration that the exculpatory and limitation-of-liability provisions in the Master Agreement are unenforceable because they purport to allow Fiserv to exempt itself from liability for damages caused by its grossly negligent, intentional, fraudulent, tortious, or other conduct for which an exculpatory provision or a limitation-of-liability provision is against public policy.

**ANSWER**: Deny the allegations of Paragraph 182.

183. **No Obligation to Pay Future Invoices**. MWFFCU disputes any obligation to pay any future invoices on the grounds that:

a. Fiserv's material breaches and repudiation excuse further performance by MWFFCU;

b. Fiserv's failure of consideration discharges MWFFCU's payment obligations;

c. Fiserv's prior material breach and repudiation bars enforcement of the Master Agreement's payment provisions; and

d. The Master Agreement is subject to rescission.

**ANSWER**: Deny the allegations of Paragraph 183, including allegations of subparagraphs (a) through (d).

184. **No Obligation to Pay Early Termination Fees, Liquidated Damages, Deconversion, or Post-Termination Fees (Contract Defenses and Public Policy).** MWFFCU is entitled to declarations that it has no obligation to pay Fiserv early termination fees, liquidated damages, "deconversion," or other post-termination fees because of the following:

a. Fiserv has no right to enforce the Master Agreement due to its material breaches, fraudulent performance, failure of consideration, commercial impracticability, and

frustration of purpose.

b. The fees at issue, other than liquidated damages, are not quantified in the Master Agreement and therefore unenforceable under the doctrine of indefiniteness and because they are not reasonable.

c. The early termination fees or liquidated damages provisions are unenforceable penalties because they purport to entitle Fiserv to payment without regard to Fiserv's own wrongful conduct, and without regard to the substantial independent reasons why MWFFCU may seek to terminate the Master Agreement to ensure its members are properly protected. The only legitimate purpose of such provisions would be to compensate for actual harm that is difficult to quantify. But if such provisions coerce action or punish—as they do here—they are unenforceable penalties. The plain purpose of these provisions is to coerce MWFFCU into maintaining its relationship with Fiserv. Moreover, even if these provisions are not unenforceable penalties, to the extent Fiserv relies on them for indemnification or recovery of amounts incurred as a result of its own wrongful acts, such provisions are unenforceable under New York law.

**ANSWER**: Deny the allegations of Paragraph 184, including allegations of subparagraphs (a) through (c).

185. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as fully set forth here.

**ANSWER**: Defendants incorporate their responses to the allegations of Paragraphs 1 through 184 as though fully set forth herein.

186. Fiserv Solutions induced MWFFCU to pay it by issuing invoices. These invoices,

delivered on a recurring basis, conveyed expressly and by implication that the invoiced services had been properly performed and that the invoiced amounts were owed to Fiserv Solutions.

**ANSWER**: Admit that Fiserv issued invoices to Midwest on a recurring basis for services that were performed and amounts owed to Fiserv; except as so stated, deny the allegations of Paragraph 186.

187. In reality, Fiserv Solutions had not performed as promised. Fiserv Solutions' invoices overstated the amounts MWFFCU owed, and Fiserv Solutions withheld material facts about the security deficiencies in its systems. Fiserv Solutions' systems were so insecure that they were not even minimally suitable for storing a regulated credit union's confidential information.

**ANSWER**: Deny the allegations of Paragraph 187.

188. As a result of this misconduct, MWFFCU mistakenly conferred a benefit on Fiserv Solutions in the form of payments for deficient or non-performed services.

**ANSWER**: Deny the allegations of Paragraph 188.

189. Fiserv Solutions was unjustly enriched by those payments. Equity and good conscience require Fiserv Solutions disgorge and make restitution of the amounts MWFFCU paid, with interest.

**ANSWER**: Deny the allegations of Paragraph 189.

190. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

**ANSWER**: Defendants incorporate their responses to the allegations of Paragraphs 1 through 189 as though fully set forth herein.

191. MWFFCU is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. MWFFCU's trade secrets include, but are not limited to,

the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of Midwest's allegations that it owns or holds certain trade secrets and, therefore, deny the allegations; deny that any of the data or information in the custody, possession, or control of Defendants in connection with the services that Fiserv provided to Midwest constitute trade secrets; except as so stated, deny the allegations of Paragraph 191.

192. MWFFCU's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 192 and, therefore, deny the allegations.

193. Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

**ANSWER**: Deny the allegations of Paragraph 193.

194. MWFFCU has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Fiserv protect their secrecy pursuant to the Master Agreement, Fiserv's Privacy Notice, and in accordance with the policies, procedures, and commitments announced by Fiserv.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 194 and, therefore, deny the allegations.

195. MWFFCU has invested substantial resources in developing, compiling, and

protecting its trade secrets. These trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, MWFFCU's competitors or others who could obtain economic value from their disclosure or use. For example, MWFFCU's compilation of confidential member financial information and detailed transactional history (which includes past loan payment history, savings account history, checking account overdraft history, and the regularity and amounts of deposits into savings accounts), allows MWFFCU to assess loan risk more accurately than competitors lacking that information and, in turn, to offer its members loans and savings products at highly competitive rates. MWFFCU's trade secrets thus provide it with a concrete competitive and economic advantage that would be lost if they were disclosed to or used by a competitor.

**ANSWER**: State that Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations of Paragraph 195 and, therefore, deny the allegations.

196. Fiserv knew or should have known that MWFFCU's information at issue comprised MWFFCU's trade secrets.

**ANSWER**: Deny the allegations of Paragraph 196.

197. Fiserv misappropriated and continued to misappropriate MWFFCU's trade secrets by acquiring and continuing to acquire them through improper means, including by misrepresenting to MWFFCU the existence and nature of Fiserv's security controls. Had Fiserv provided truthful information to MWFFCU, it would not have furnished its trade secrets to Fiserv and allowed, and continued to allow, those trade secrets to be stored and accessible on Fiserv's insecure systems.

**ANSWER**: Deny the allegations of Paragraph 197.

198. At the time of Fiserv's use and/or disclosure of MWFFCU's trade secrets, Fiserv

knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to MWFFCU to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Fiserv's position.

**ANSWER**: Deny the allegations of Paragraph 198.

199. Fiserv's misappropriation of MWFFCU's trade secrets was done for its own commercial advantage, allowing Fiserv to obtain and retain excessive payments from MWFFCU.

**ANSWER**: Deny the allegations of Paragraph 199.

200. Fiserv's acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq.

**ANSWER**: Deny the allegations of Paragraph 200.

201. Fiserv's misappropriation was willful and malicious, entitling MWFFCU to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

**ANSWER**: Deny the allegations of Paragraph 201.

202. As a direct and proximate result of Fiserv's misappropriation of MWFFCU's trade secrets, MWFFCU has suffered and will continue to suffer damages and harm.

**ANSWER**: Deny the allegations of Paragraph 202.

203. MWFFCU repeats and re-alleges the allegations in the foregoing paragraphs as if fully set forth here.

**ANSWER**: Defendants incorporate their responses to the allegations of Paragraphs 1 through 202 as though fully set forth herein.

204. Fiserv fraudulently misrepresented its data security practices and knowingly

concealed their profound deficiencies. Relying on these deceptive assurances, MWFFCU entrusted Fiserv with highly sensitive confidential information, a trust Fiserv intentionally violated.

**ANSWER**: Deny the allegations of Paragraph 204.

205. As set forth above, Fiserv fraudulently misrepresented the existence and nature of the security controls that were in place to protect MWFFCU's confidential information.

**ANSWER**: Deny the allegations of Paragraph 205.

206. As set forth above, Fiserv also fraudulently represented its performance and intention to perform under the Master Agreement, including by withdrawing security features mid-contract and forcing upgrades to "SecureNow."

**ANSWER**: Deny the allegations of Paragraph 206.

207. Likewise, statements in Fiserv's *Security Overview* were false and misleading when made. At the time Fiserv furnished the *Security Overview* to MWFFCU, Fiserv had not aligned its cybersecurity standards and practices with the representations in the *Security Overview*, including the NIST framework. Nor is the Fiserv cybersecurity program built on the NIST framework. Moreover, and as further explained below, Fiserv does not comply with the NIST framework, including all associated updates.

**ANSWER**: Deny the allegations of Paragraph 207.

208. Statements in Fiserv's *Standard Information Gathering Questionnaire* were false and misleading when made. At the time Fiserv furnished the *Standard Information Gathering Questionnaire* to MWFFCU, Fiserv did not comply with accepted control standards, frameworks, and industry practices, including NIST authentication requirements. Additionally, Fiserv did not utilize MFA on at least one of its systems, and the authentication process used does not meet recognized standards for MFA.

**ANSWER**: Deny the allegations of Paragraph 208.

209. Fiserv also fraudulently represented its "Enhanced Authentication" service to MWFFCU. As set forth above, "Enhanced Authentication" fails to provide MFA that meets baseline standards for authentication.

**ANSWER**: Deny the allegations of Paragraph 209.

210. Statements in the *Fiserv Cybersecurity Fact Sheet 2025* further fraudulently represented that Fiserv's policy and standards "have been designed to meet applicable industry and regulatory requirements," including NIST's "Cyber Security Framework, 800-53, 800-63-3." As set forth above, Fiserv's use of an "email passcode challenge" as a purported second factor for MFA violates NIST Special Publication 800-63-3, which expressly prohibits email from being used for MFA.

**ANSWER**: Deny the allegations of Paragraph 210.

211. Moreover, Fiserv's failure to implement multi-factor authentication constitutes both fraud and fraudulent misrepresentation. By accepting payment for security services it had no intention of providing, Fiserv deliberately deceived MWFFCU about the actual level of protection afforded to its confidential information. Fiserv intentionally and willfully defrauded MWFFCU while placing thousands of MWFFCU's members at risk.

**ANSWER**: Deny the allegations of Paragraph 211.

212. Even after being directly confronted about this fraud, Fiserv continues its deception. On September 19, 2025, counsel for MWFFCU sent a demand letter to Fiserv explicitly identifying the failure to implement two-factor authentication despite receiving payment for such services. *See* Exhibit 13. Rather than implementing the promised security measures, Fiserv responded by disputing its breach. *See* Exhibit 14. Fiserv then pivoted, insisting on "sunsetting" its existing

authentication protocol and demanding that MWFFCU implement another deficient product, "SecureNow," and pay more for the privilege.

**ANSWER**: Admit that counsel for Midwest sent a demand letter to Defendants on or around September 19, 2025; state that to the extent Paragraph 212 purports to describe, quote, or characterize Exhibits 13 and 14, those documents speak for themselves; except as so stated, deny the allegations of Paragraph 212.

213. Fiserv's continued failure to provide multi-factor authentication after being put on notice of this issue demonstrates the fraudulent nature of the original transaction. A company acting in good faith would have immediately implemented the security measures upon discovering an oversight. Instead, Fiserv's response confirms that its original acceptance of payment without even intending to hold its end of the bargain was intentional.

**ANSWER**: Deny the allegations of Paragraph 213.

214. Further, independent of any specific misrepresentations made by Fiserv, MWFFCU reasonably and justifiably relied on Fiserv to provide a service with at least minimally adequate measures to protect the confidentiality of MWFFCU's information and MWFFCU is entitled to presume, and did expect, that Fiserv would take appropriate measures to keep its information safe. Fiserv did not disclose at any time to MWFFCU that its information was vulnerable to hackers because Fiserv's security was inadequate. Fiserv was the only one in possession of that material information, which it had a duty to disclose. Fiserv misrepresented, both by affirmative conduct and by omission, the security of its systems, their ability to authenticate authorized users, their ability to safely store and process MWFFCU's information, and the security measures and services that have been provided to MWFFCU. Fiserv also engaged in deception by actively concealing (a) Fiserv's failure to implement reasonable and appropriate security measures, (b) Fiserv's failure to

follow industry standards and regulatory guidelines for data security; (c) information about Fiserv's security problems (including by threatening another Fiserv customer who uncovered a security problem through litigation); and (d) Fiserv's failure to comply with its own policies, notices, and agreements. MWFFCU justifiably relied on Fiserv, which had a duty to disclose material facts that would undermine MWFFCU's reasonable reliance on these subjects. Fiserv has special knowledge of information regarding these subjects that is not reasonably ascertainable by MWFFCU.

**ANSWER**: Deny the allegations of Paragraph 214.

215. MWFFCU reasonably and justifiably relied on Fiserv's misrepresentations, concealments, acts, and omissions to its detriment by, among other things, entering into the Master Agreement and other transactions with Fiserv, making payments to Fiserv, and furnishing confidential information to Fiserv.

**ANSWER**: Deny the allegations of Paragraph 215.

216. Fiserv knew or should have known that its misrepresentations, concealments, acts, and omissions were false or recklessly made without regard to their falsity, were material to MWFFCU, and were made with the intent of misleading MWFFCU into relying upon them, and MWFFCU did so justifiably rely. Further, the falsity of Fiserv's misrepresentations, concealments, acts, and omissions was within Fiserv's peculiar knowledge and could not have been reasonably discovered by MWFFCU.

**ANSWER**: Deny the allegations of Paragraph 216.

217. By Fiserv's misrepresentations, concealments, acts, and omissions, Fiserv defrauded MWFFCU, including fraudulently inducing MWFFCU to contract with, and continue to receive services from, Fiserv.

**ANSWER**: Deny the allegations of Paragraph 217.

218. As a direct and proximate result of Fiserv's fraud, MWFFCU has suffered and will continue to suffer damages and harm.

**ANSWER**: Deny the allegations of Paragraph 218.

## JURY TRIAL DEMAND

Defendants deny that Midwest is entitled to a trial by jury on any of the claims set forth in its Complaint based on the clear and unequivocal jury-trial waiver in the Master Agreement.

## DEMAND FOR RELIEF

Answering the allegations contained in the portion of the complaint titled "Demand for Relief," Defendants deny that Midwest is entitled to any relief.

## AFFIRMATIVE AND OTHER DEFENSES

Without assuming any burden of proof or persuasion otherwise resting on Midwest, for their affirmative defenses and/or other defenses, Defendants hereby incorporate by reference their responses to the allegations of Paragraphs 1 through 218 as though fully set forth herein and allege as follows:

### FIRST AFFIRMATIVE AND/OR OTHER DEFENSE

Fiserv, Inc. has no contractual or other relationship with Midwest and is not a proper party to this action. Fiserv, Inc. is not a signatory to the Master Agreement and has not engaged in any business dealings with Midwest. The services provided to Midwest were through Fiserv Solutions, LLC, and there is no allegation or evidence of any contractual obligations by Fiserv, Inc. with respect to Midwest's relationship with Fiserv Solutions, LLC under the Master Agreement.

### SECOND AFFIRMATIVE AND/OR OTHER DEFENSE

Midwest's claims are barred, in whole or in part, by the applicable statute of limitations,

which may include but are not limited to, N.Y. C.P.L.R. §§ 213, 214; 18 U.S.C. § 1836(d); Indiana Code §§ 34-11-2-7, 34-11-2-9. Midwest further acknowledges in the First Amended Complaint that its claims may be barred by the applicable statute of limitations, and its allegations that such period has been tolled are conclusory and without merit. (FAC. ¶¶ 150-156.)

**THIRD AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the applicable contractual limitations period set forth in Section 7 of the Master Agreement.

**FOURTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the Master Agreement, including, but not limited to, Sections 4, 6, 7, 10 and 12 of the Master Agreement, and Sections 3, 4, and 7 of the ASP Services Exhibit, which collectively bar claims inconsistent with the contract's terms and limit Midwest's remedies.

**FIFTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's tort, equitable, and statutory claims are barred, in whole or in part, because Midwest's alleged damages are purely economic and arise, if at all, entirely from a contractual relationship, not from any independent tort duty. Each of Midwest's tort, equitable, and statutory claims is duplicative of Midwest's breach of contract claim and fails to allege any separate duty owed to Midwest or breached by Defendants.

**SIXTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the doctrine of consent because, *inter alia*, Midwest was aware of any alleged potential security risk and voluntarily contracted for the services it received from Fiserv despite knowledge of these alleged risks, knew or should have known of the capabilities those services provided, and chose not to implement additional security

features before or after initiating this action.

**SEVENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the doctrine of waiver because, *inter alia*, Midwest received the benefits of the services it contracted for with Fiserv, entered into multiple contractual amendments after receiving the services it bargained for, and waited to file suit until many years after it began its contractual relationship with Fiserv based on purported security deficiencies that it knew, or should have known, about long ago.

**EIGHTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the doctrine of laches because of Midwest's unreasonable delay in bringing claims, despite Midwest's long-standing knowledge of and access to the products and services it receives under the Master Agreement, thereby prejudicing Defendants' ability to defend against these claims. Midwest received the benefits of the services it contracted for with Fiserv, entered into multiple contractual amendments after receiving the services it bargained for, and waited to file suit until many years after it began its contractual relationship with Fiserv based on purported security deficiencies that it knew, or should have known, about long ago.

**NINTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the doctrine of estoppel because, *inter alia*, Midwest accepted the terms and conditions of the Master Agreement, including the limitations on liability and limited warranties, and cannot now claim damages for issues it agreed to assume responsibility for, including responsibility for ensuring that the products and services Midwest received under the Master Agreement satisfied Midwest's operational requirements.

**TENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the doctrine of ratification because, *inter alia*, Midwest entered into multiple contractual amendments with Fiserv to continue the parties' contractual relationship after it knew, or should have known of, the purported security deficiencies alleged in the First Amended Complaint.

**ELEVENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred, in whole or in part, by the doctrine of unclean hands because, *inter alia*, after years of receiving the products and services Midwest contracted to receive, Midwest initiated this action with the goal of creating leverage to obtain relief unrelated to any purported security concern.

**TWELFTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Upon information and belief, Midwest has failed to mitigate any actual damages it alleges to have incurred because, *inter alia*, Midwest was aware of the operating features of the products and services it receives under the Master Agreement for years, did not at any time before September 19, 2025 notify Fiserv of any alleged security deficiency or request available product enhancements or security features on these products and services, failed to utilize the security features and enhancements that have been available to Midwest, and failed to act promptly to limit its alleged damages. Indeed, as of the date of this filing, Midwest has refused to migrate to the upgraded authentication method offered by Fiserv, SecureNow.

**THIRTEENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest has not alleged or sustained any actual damages caused by the Defendants or for which the Defendants are liable. All or portions of any harm allegedly suffered by Midwest are attributable to causes other than any alleged conduct, acts or omissions of the Defendants.

**FOURTEENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

At all times, Defendants acted in good faith and with clean hands because, *inter alia*, Defendants provided all services they contracted to provide, if any, to Midwest, did not misappropriate any of Midwest's trade secrets, and did not commit any fraud or any other unlawful conduct against Midwest as alleged in the First Amended Complaint.

**FIFTEENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims for punitive damages are waived in and barred by Section 7 of the Master Agreement.

**SIXTEENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims for punitive damages fail because Defendants did not act with malice or reckless indifference to Midwest's rights, or engage in willful, deliberate, malicious, wanton, or outrageous conduct. Midwest's claims for punitive damages are limited and/or barred by the Fourteenth, Fifth, and Eighth Amendments to the United States Constitution, and by the laws of the United States and Indiana.

**SEVENTEENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims for injunctive relief and specific performance fail because any harm allegedly suffered by Midwest can be adequately remedied at law, Midwest has not plausibly alleged an actual or imminent threat of harm, and Midwest will not face irreparable harm absent injunctive relief.

**EIGHTEENTH AFFIRMATIVE AND/OR OTHER DEFENSE**

Midwest's claims are barred because Midwest lacks standing, including associational standing, to assert the claims in the First Amended Complaint. Midwest has not alleged a direct injury or a sufficient connection to the alleged harm, as the claims asserted primarily concern potential risks rather than actual damages suffered by Midwest or its members, and Midwest does

not have standing to assert claims for speculative harm on behalf of itself or its members, with whom Defendants have no contractual or other relationship. Midwest's members have not suffered any cognizable harm and any alleged harm would not be recoverable by Midwest.

**RESERVATION OF DEFENSES**

Due to the lack of information as to matters set forth in the Complaint, Defendants have insufficient information or belief as to whether they have additional, unstated affirmative and specific defenses available. Defendants do not waive any additional or further defenses, and they explicitly reserve the right to assert any additional or further defenses as may be revealed during discovery or otherwise and reserve the right to amend this Answer to assert any such defenses.

Dated this 13th day of October, 2026.

/s/ *Bryan B. House*

Bryan B. House*
Timothy J. Patterson*
Grace E. Stippich*
**FOLEY & LARDNER LLP**
777 E. Wisconsin Avenue
Milwaukee, WI 53202-5306
Telephone: (414)271-2400
bhouse@foley.com
tjpatterson@foley.com
gstippich@foley.com
*Admitted *pro hac vice*

Wayne C. Turner (2289-49)
Riley H. Floyd (34014-29)
**HOOVER HULL TURNER LLP**
111 Monument Circle, Suite 4400
Indianapolis, IN 46204
Telephone: (317) 822-4400
wturner@hhtlaw.com
rfloyd@hhtlaw.com

*Attorneys for Defendants Fiserv Solutions, LLC and Fiserv, Inc.*